R. M. FIELD,<br>
<em>of Counsel for Appellants.</em>

———— •◆•• ————

PACIFIC RAILROAD, Defendant in Error, v. HUGHES, Plaintiff in Error.

1. The acceptance by the Pacific Railroad of the act of March 1, 1851, amendatory of its original charter, did not discharge one, who had previously made a subscription to the capital stock of said company, from his obligation to pay calls regularly made upon such subscription ; nor did the act of December 25, 1852, (Sess. Acts, 1853, p. 10,) in so far as it fixed the location of the Pacific Railroad. (Renshaw v. Pacific Railroad, 18 Mo. 210, affirmed.)

2. When legislative changes in a charter of incorporation of a railroad are such as consist only of an increase of the corporate powers, or of a different or. ganization of the corporate body, leaving it with lawful power to execute what may be considered as substantially the original object of its creation, one who has previously subscribed to the stock of said railroad company can not set up such changes as a defence at law to an action for calls upon such subscription of stock. The remedy, if any, is in equity.

*Error to St. Louis Court of Common Pleas.*

This was an action brought by the Pacific Railroad to recover calls made upon a subscription of ten shares of stock of plaintiff taken by defendant, Hughes. The action is founded on the sixth section of the original act of incorporation, approved March 12, 1849. (Sess. Acts, 1849, p. 220.) Defendant's subscription was made February 8, 1850. The defence relied on was that subsequent acts of the legislature, to-wit, that approved March 1, 1851, (Sess. Acts, 1851, p. 268,) and those approved December 25, 1852, (Sess. Acts, 1853, p. 10, 363 )— being amendatory of the original charter, and having been accepted by plaintiff without the consent of defendant, had effected such changes in said charter as to discharge the defendant from his obligation to pay subsequent calls upon his subscription of stock.

The seventh section of the original act of incorporation, (Sess. Acts, 1849, p. 219,) gave to the Pacific Railroad "full power to survey, mark, locate and construct a railroad from the city of St. Louis to the city of Jefferson, and thence to some point in the western line of Van Buren county (now Cass county) in this state, with a view that the same may be hereafter continued westwardly to the Pacific ocean."

By the ninth section of the amendatory act of March 1st, 1851, the seventh section of the original charter was repealed, and power was given to the company " to survey, mark out, locate and construct a railroad from the Mississippi river, or any other point in the city of St. Louis, on any route the said company may deem most advantageous, to any point on the western line of this state which the said company may select."

By the fourth section of this act, the seventh section of the general act concerning corporations (R. C. 1845, p. 230), which provides that "the charter of every corporation that shall hereafter be granted by the legislature, shall be subject to alteration, suspension and repeal in the discretion of the legislature," which was left in full force, as respects plaintiff, by the original act of incorporation, was abrogated as respects said plaintiff.

By the eleventh section of an act approved December 25, 1852, (Sess. Acts, p. 12,) it was provided that "the Pacific railroad shall be deemed a railroad beginning in the city of St. Louis, and running westwardly by the way of Jefferson city, and thence along the best and most practicable inland route through the county of Johnson, and terminating at any point in Jackson county which may be designated by the said company, any thing contained in the charter thereof to the contrary notwithstanding." By the second section of this act it was provided that "the Pacific Railroad may lay out, construct and maintain a line of railway or branch railroad, with a single or double track, from any point on the main line of the Pacific railroad east of the Osage river, to any point on the western boundary of this state, south of the Osage river, which the said corporation may select," &c. The tenth section of this act is as follows : "The said company shall keep separate accounts of the cost of surveying, locating, constructing, maintaining, altering and operating said southwestern branch railroad, and also of the earnings thereof, and may, if the board of directors shall deem it advisable, create a new stock for said branch, and shall apply the same, as well as the proceeds of the lands due to said south-western branch, and the proceeds of the bonds authorized by the ninth section of this act, exclusively to the construction of said south-western branch, and pay the dividends declared from the nett profits of said branch to those who shall become stockholders therein, or their legal representatives, according to their respective shares."

By section first of another act of the general assembly, ap-

proved December 25, 1852, (Sess. Acts, 1853, p. 363,) power was given to the Pacific Railroad company " to extend and construct a branch railroad from any point on the main trunk line or the south-west line, not nearer than twenty miles of St. Louis, to the Iron Mountain, in St. François county, and Pilot Knob, in Madison county, and may extend the same to the Mississippi river, and also to the boundary line of the state of Arkansas ;" " and the said company shall keep separate accounts of the operations of said branch road, including the cost of construction, and the earnings thereof, and shall make dividends of its nett earnings among the stockholders in said branch and the Pacific railroad," &c.

·The finding of the facts by the court is as follows : " That the defendant subscribed to ten shares of the capital stock of the plaintiff, and agreed to pay the calls as charged in the petition ; that the various calls set out in the petition were duly made, and that the defendant failed and refused to pay the several calls which the petition charges he failed and refused to pay ; that the several acts of the general assembly stated in the answer were passed amending the charter of said plaintiff subsequent to said subscriptions by the defendant, and that the defendant did not consent to any of said amendatory acts ; that the board of directors of the plaintiff and a majority of the stockholders assented to and accepted said amendments to the charter, and the plaintiff is acting under said amendments. The south-west branch, authorized to be constructed by the act of the general assembly, has been surveyed and located, and the costs of surveying and locating the same, amounting to $40,000, has been paid out of the general funds of the plaintiff. Said branch begins to diverge from the main road at a point about forty miles from St. Louis, and said branch is about 181 miles long. The plaintiff has held no election to obtain the consent of the stockholders to build said branch out of the common stock, and it has not yet been determined whether the said branch shall be built by the creations of separate stock or out of the common stock. A contract has been

made by the plaintiff for the construction of the said branch, and the work done with reference to said branch has been paid for, thus far, out of the common funds of the plaintiff. Some stock has been subscribed separately for said branches, but nothing has as yet been paid on said stock subscriptions, nor has any of the lands ceded to the plaintiff, for the construction of said branch, been sold. The plaintiff keeps distinct accounts for said branch—accounts entirely distinct from the accounts for the construction of the main road. The said south-western branch is to cost between eight or nine millions of dollars. The plaintiff caused surveys to be made for about sixty miles for the Iron Mountain branch, and paid the expenses thereof. The plaintiff has relinquished the said Iron Mountain branch. The amount of calls due from the defendant to the plaintiff, on defendant's subscription, was, at the commencement of this suit, two hundred dollars; that the interest on said calls, from the *times they were respectively due*, amounts to thirty-one dollars. Thereupon, the court declares that the plaintiff is entitled to recover the sum of two hundred and thirty-one dollars and costs." Judgment was accordingly given for that sum.

*Dayton* and *Buckner*, for plaintiff in error. 1. At the time of defendant's subscription of stock the general assembly had power, under the 7th section of the general act concerning corporations, to alter or modify or amend any charter of incorporation, even against or without the consent of the stockholder. (Renshaw v. Pacific Railroad, 18 Mo. 210.) By the amendatory act of March 1, 1851, this power was abandoned as respects the Pacific railroad. After the passage of this act the general assembly could not make any essential change in the charter of plaintiff, without its consent; nor could the consent of the corporation, or a majority of the stockholders, to such a change, bind any stockholder refusing to ratify the amendatory act. 2. The act of December 25, 1852, worked a thorough and essential change in plaintiff's powers. It was in fact a new charter. It is no answer to this to say that the company was authorized to keep separate accounts between the main trunk

road and the branch road, and could also have a separate and distinct stock. The same company had the construction of both roads, and the mere authority given to the company to determine whether five hundred miles of railroad, instead of two hundred and fifty, should be constructed, and eighteen millions of dollars instead of half that sum expended, was such a change in the contract of defendant as to abrogate it entirely. It has not yet been determined whether new stock shall be issued or not, as authorized by the act of December 25, 1852. All expenses for both roads have, as yet, been paid out of a common fund. 3. Defendant contracted to pay a certain sum towards the construction of one road in this state. He can not rightfully be required, under that agreement, to contribute towards building two roads, with different interests, extending double the distance, and costing twice as much money.

*Glover & Richardson* and *T. T. Gantt*, for defendant in error. 1. The construction of the south-west branch was not to be a burden on the stockholders of the Pacific railroad unless it should be so agreed. This was never done. The case stands thus. The same trustees stand charged with the execution of two separate and different offices. To this there can be no legal objection. The burden of constructing the south-west branch was never assumed either on separate or joint account. There was then no enlargement of the powers, duties or burdens of the Pacific railroad company. 2. It must be shown that the Pacific railroad company has legally bound itself to appropriate defendant's money to build the south-west branch, or he has no just cause of complaint. 3. The fact that the company may have expended money illegally in making the surveys of the Iron Mountain railroad, and the south-west branch, will not discharge the defendant from his liability to pay his subscription. 4. The act of December 25, 1852, was either void or not void. If not void, if it was competent for the legislature to pass an act operative, *proprio vigore*, on the old subscribers, there is an end of the case. If void, then the law has no effect, and every old subscriber may have his remedy, if the

company misapply or attempt to misapply the funds receivable for the original undertaking. Should the misapplication have occurred, the directors are liable for a breach of their trust; should it be attempted or contemplated, the remedy is by injunction. 5. The act of 1852 is not obligatory on the company without its acceptance. This acceptance can be made effectually only in one. way; by convening the stockholders and taking the sense of them on the point of acceptance or rejection. This does not appear ever to have been done. Nor does it appear that there has been any certificate of such acceptance filed in the office of the secretary of state, within six months of December 25, 1852. This being so, the act of that date is void, and, so far as the company has been assuming to act under it, their acts have no legal sanction; but this does not discharge subscribers. (See sec. 15 of Act of December 25.)

LEONARD, Judge, delivered the opinion of the court.

After the company was incorporated, Mr. Hughes subscribed for the stock, for the calls upon which this suit is instituted. The remedy, by personal action, is given by the 6th section of the charter, which authorizes the company to make calls for the payment of the capital stock as they may deem proper; " and if any stockholder shall fail to pay any such requisition within ten days after the time appointed, to recover the same with interest; and if not collected, the company may declare the stock forfeited and sell the same." Subsequently, the amendatory act of 1st March, 1851, and the two amendatory acts of 25th December, 1852, were passed and accepted by the company; but the defendant, not having assented to them, insists that the effect of them is, *ipso facto*, as a matter of law, to discharge him from his obligation to pay the subsequent calls upon his stock, and this is the question we are now called upon to settle.

When an unincorporated joint stock company is formed, the rights of the partners, not only as between themselves individually, but also between each member and the whole body of the

subscribers, are usually settled by the articles of association or a deed of settlement. These articles, constituting the association, and regulating not only the powers of the majority, but also the rights of each stockholder, are the constitution of the society, and of course can not be changed without the consent of every member ; and therefore, if the company attempt to appropriate the funds to a purpose not authorized by the articles, or assume powers not conferred by the constitution of the company, the law will protect the minority by an injunction or a decree for a dissolution of the company, and an account and distribution of its effects, as the character of the act complained of may require.

And it may be that the same law ought to prevail when a mere private company, charged with no public duties, and acting alone with a view to the interests of its members, acts under a charter of incorporation, upon the principle that the charter then stands as the constitution of the society in lieu of articles of asssociation, and regulates the rights and duties both of the company and the stockholders, pursuant to their mutual agreement. Accordingly, there are cases in the books of proceedings against incorporated joint stock companies, by individual members, to restrain the company from misapplying the corporate funds ; and this relief may be extended even to a dissolution of the society, and an account and distribution of its effects, if the case require it, upon the same principles that similar relief is administered in ordinary partnerships.

But it must be observed that there is an admitted distinction between a company acting under mere articles of association and one acting under a charter of incorporation, in reference to the control of the majority over the constitution of the company. In the one case the articles are inviolable in every particular, no matter how minute, unless a power to alter is expressly given to the company ; in the other, as the law authorizes the government to change the charter, with the assent of the majority, it may be said that there is an implied assent on the part of each stockholder to all such changes. It is insisted, how-

Pacific Railroad v. Hughes.

ever, that this implied assent does not extend to such fundamental changes as make the amended charter an entirely different enterprise ; changing, for instance, a charter for a canal into one for a railroad or a charter for a road ; to accommodate one line of travel, into one for a road for the accommodation of an entirely different line ; nor to changes that materially alter the constitution of the society, or greatly enlarge its powers.

In England, however, where private property is, perhaps, as well protected as in our own country, no such limitation appears to be recognized in reference to this implied assent of all the stockholders to future changes in the constitution of the company, made by the government, with the consent of a majority of its members. Accordingly, Lord Brougham, in Ware v. Grand Junct. Wat. Co., (2 Russ. & Mylne, 470,) refused to restrain a railroad company from applying to parliament for an enlargement of its powers and for fundamental changes in its constitution, upon the ground that it was the right of the company to procure these changes, if they desired them ; and that all who became stockholders, did so with their eyes open to this power of the majority over the constitution of the society. We remark here, too, that a distinction seems to exist in the English courts between mere private corporations, acting exclusively for the benefit of their members, as banking and other similar companies, and railroad companies, that must be considered as acting partly with a view to the public interest, in consideration of which they obtain from the government the right of taking compulsorily the land of private individuals for the use of the road. (Ffooks v. The Lond. & S. W. Railroad Co., 19 Eng. Law & Eq. Rep. 11.)

But, however all this may be, and recognizing for the purposes of the present case the right of each stockholder to resist fundamental changes in the charter to his injury and against his consent, it seems to us that the American cases that have allowed this matter to be set up at law, as a defence to a suit for calls upon stock taken, have not been very well considered, are without any precedent in the English courts, are

not warranted upon just legal principles, and can not be carried out in practice without infinite mischief, not only to the public interests involved in all great works of this character, but also to the private rights of the other members of the company. If the dissenting member is released at law by the mere effect of these fundamental changes, it is because they have of themselves broken up, without any judicial sentence to that effect, the original association, on account of the inability or unfitness of the corporation, as now constituted, to execute the original purposes of the association. It is very evident, however, that whenever this question is to be discussed and settled, there are other parties interested in it besides the complaining stockholders and the corporate body. The members of this company have agreed with one another to construct a railroad out of a joint fund, to which each has contributed in proportion to the share he is to have in the work when completed ; and it is not and ought not to be in the power of any one or more of the partners, at pleasure, to break up this undertaking by withdrawing the fund already advanced ; or, which is the same thing, by withholding what he has agreed to contribute ; nor ought the courts of justice, by their judgments, to produce this result, unless in a case proper for such relief, and in which all the interests to be affected are represented before the court. Whether, however, the alleged changes in the constitution of this company, procured, or at least assented to by a majority of the company, are of such a character as to warrant the interference of the courts at the instance of a dissenting stockholder, by injunction against a probable misapplication of the funds, or by a decree for a dissolution of the original association, on account of the unfitness or inability of the corporation, as now constituted under the amended charter, to execute the original purpose of the partners, need not be now determined. In the view we take of the case, it is enough—yielding to this stockholder all the rights that he would have in a private joint stock company, acting under voluntary articles of association—without any power in the company to change the objects of as-

sociation, or alter, in the least, the constitution of the society—that his remedy for a wrong of the character of the present one, is a suit in equity, in which all the parties in the matter to be litigated may be heard, and complete justice done to all upon the final determination of the case. And to this view of the subject we incline, notwithstanding some of the American cases to which we have been referred hold quite a different doctrine, and allow fundamental changes in a charter to be used by a stockholder as a defence at law against subsequent calls upon stock previously subscribed, but with considerable difference of opinion as to the character and extent of the changes necessary to produce this result.

In reference to this defence at law, we remark, that the only cases we have found in which the relief was actually granted upon the ground suggested, are, The Union Lock & Canal Co. v. Towne, 1 N. H. 44; Hartford & N. H. Railroad v. Croswell, 5 Hill, 385; and Winter v. The Musco. R. Co., 11 Geor. 451; although, in the cases of Indiana & Ebensburg Turnp. Co. v. Phillips, 2 Penn. Rep. 184; Penn. & Ohio Can. Co. v. Webb, 9 Ohio, 139; Barrett v. Sangamon & Alton Railroad, 13 Illinois, 505, and Green. & Col. R. Co. v. Coleman, 5 Rich. 140, the general doctrine is recognized upon the authority of previous cases in Massachusetts, New Hampshire and New York, but not applied on account of the character of the charges made.

In the New Hampshire and New York cases, the stockholders were discharged at law from the calls upon their stock, because the legislature had subsequently increased the power of the company, in one case, authorizing it to purchase a hundred instead of six acres of land; and in the other, allowing it to run a line of steamboats from the termination of their road; and in Georgia, the original termination of the road was changed to a new point, fifty miles short of it, and in a different direction. These are, it is believed, the first cases in which this doctrine was put in practice, and the authorities referred to for it are two cases from Massachusetts, Mid. Turnp.

Co. v. Locke, 8 Mass. 268, and Med. Turnp. Co. v. Swan, 10 Mass. 384; a case from New York, Livingston v. Lynch, 4 John. Ch. Rep. 573, and the case from Pennsylvania, of Ind. and Eben. Turnp. Co. v. Phillips, 2 Penn. 184.

A careful examination of the Massachusetts cases, to which all the others refer, will show, it is believed, that they contain no such doctrine as that applied in the cases that cite them as authority. The only question in them was, whether the company could recover upon an express collateral promise of the stockholder to pay calls; and while it was holden that it could not, because, under the circumstances attending the promise, it could not be considered as made to the company, it was at the same time admitted that the party was a member of the company as then constituted, and liable as such to all the remedies provided by the charter in respect to calls upon stock subscribers.

The case from Johnson's Ch. Reps. was a suit in equity, and the decree of the chancellor establishes that in a *private* joint stock company the majority can not change the constitution of the society as established by its members, without the consent of every one; and how the case of the Ind. and Ebensb. Turnp. Co. v. Phillips is now considered in Pennsylvania, is shown by the subsequent cases, already referred to, of Irwin v. Turnp. Co., and Gray v. The Monongahela Nav. Co.

The English cases referred to in the briefs, we think, afford no countenance to the doctrine here insisted upon. We remark, however, that there is a manifest distinction between the Georgia case and the cases from New Hampshire and New York. In the former, assuming that there had been a substantial legislative change in the termination of the road, so that it was quite a different enterprise from that originally contemplated, the plaintiff's right to recover further calls might be repelled upon the ground that, as the company had no power, as now constituted, under the amended charter, to build the road originally designed, it ought not to be allowed, even at law, to collect funds that it could not lawfully use; but, in the other case, the

objection is not that the funds, if used at all, must be misapplied, but that, as the company is now authorized to do other things, it may misapply them, or, at least, that it is now so changed in its constitution, that it is an unfit agency to be trusted with the application of the funds originally contributed, and should, therefore, be deprived of all control over them.

We are disposed to think that, in both classes of cases, the better and safer remedy for all persons interested would be a direct proceeding in equity, in which all the necessary parties could be brought before the court ; but, without determining this now, we are satisfied that when the changes are of the character last indicated, consisting only of an increase of corporate powers, or of a different organization of the corporate body, leaving it, with lawful power, to execute what may be considered as substantially the original work, the party can not be relieved at law in a suit for calls upon his stock.

We proceed, therefore, to an examination of the changes here complained of. They are, in the termination of the road, and in the additional powers conferred upon the company, not only to build branches, but also to issue new stock, and thereby lessen the relative power of the stockholders.

The original charter was for a " road from the city of St. Louis to the city of Jefferson, thence to some point in the western line of Van Buren (now Cass) county, in this state, with a view to its continuation westward to the Pacific ocean." The amendment of March 1st, 1851, was from the same beginning, " on any route the company may deem most advantageous to any point in the western line of this state, which the said company may select ;" and the act of 25th December, 1852, provided that the road, beginning at the same beginning, should run " westwardly by way of Jefferson city, and thence along the best and most practicable inland route through the county of Johnson, terminating at any point in Jackson county which may be designated by the company."

In Irwin v. The Turnp. Co., (2 Penn. & Watt's Rep. 470,) it was held that a change in the intermediate points of a road

would not release the stockholders from the calls ; and in the Penn. and Ohio Can. Co. v. Webb, (9 Ohio, 139,) it was remarked by the court, even in reference to changes in the terminative points : " It is not every minute change which will absolve a subscriber from his engagements. In works of this kind, some power of regulation is retained by the legislature— some discretion is confided to agents who execute the details. When the subscription is general, uncombined with conditions, perhaps the stockholder has no reason to complain of any line of transit which starts from the same point of business, accommodates the same line of travel, and substantially subserves the same general interests." The only objection, however, that could be taken here, in reference to the legislative change in the position of the road, is to that made by the act of 1st March, 1851 ; but it was decided here, in the Pacific Railroad v. Renshaw, (18 Mo. 210,) that that change did not release the stock subscribers, and there is no pretence for insisting that the subsequent change in the location of the road, made by the act of 25th December, 1852, had that effect. That act only designated one of the many routes that it was competent for the company to select under the act of March, 1851, and by accepting the amendment of 1852, and thereby selecting the route there indicated, the company only exercised the power of selection they had under the act of March, 1851.

In reference to the other amendments, it is seen that they do not put it out of the power of the company to apply the fund to the purpose for which it was subscribed, and therefore these changes, under the view we have taken of the law, constitute no defence in this action.

If the company are about to misapply the funds to the injury of any stockholder, his redress is by a direct proceeding to restrain such misapplication ; and if the company can not now be safely trusted with the funds, on account of the changes in its constitution, or if it *has* conducted or is *now* so conducting the affairs of the stockholders *as to* show that a continuation of the association can not result in effecting its original purpose,

and the stockholders, in a public corporation of this character, are entitled to the same relief to which they are entitled against a private joint stock company, (about which we refrain from expressing any opinion,) the remedy is a direct proceeding to which all the associates are made parties, either individually or by representation, and where proper relief can be administered to the complaining party, according to the exigency of the case, and consistently with the rights of others.

The result is, Judge Ryland concurring, that the judgment must be affirmed.

Scott, Judge. The question involved in this case seems to be well settled in the American courts. That a material alteration in the charter of a corporation, which is its fundamental law, will discharge a stockholder from future liability for calls on his subscription, previously made, when the alteration is effected without his consent, stands on principles of law long recognized, and founded in justice. I do not find that there is any contrariety of opinion on the subject. Courts have differed as to the extent of the change in a charter which will produce this consequence, but all of them unite in sanctioning the general rule. Although a stockholder is a member of the corporate body, yet there is an individual contract between him and that body which is defined by the terms of the charter existing at the time of his subscription. He agrees to pay his money for a specified purpose, and for that alone, and on no principle of law or justice can the corporation, without his consent, change the purpose to which he agrees it shall be applied and yet compel its payment. A payment coerced under such circumstances, would be arbitrary and tyrannical and abhorrent to all our notions of the sanctity of contracts. It is no answer that the stockholder was aware that a majority of the corporation could apply for and obtain from the legislature a change of its powers and objects. The legislature may change the charter, but it has no power to vary the contract of the stockholder against his consent. If a corporation will, against

the wishes of its stockholders, obtain a material change of its fundamental law, it must be content to lose the subscriptions which had been previously made. It is for the interest of corporations that such should be the law. What prudent man would invest his money in an enterprise which he has well considered and deemed profitable, if, at any moment afterwards, a majority of those with whom he is associated may change the character of the enterprise and compel him to pay his money in an adventure which his judgment condemns and which he sees would end in ruin ?

As this is a matter of some moment at this time, it may be as well to refer to some of the cases which have been decided in relation to it. As far as I have examined, they are of one tenor. In the case of the Middlesex Turnpike Cor. v. Locke, (8 Mass. 268,) it was determined that where the directors of a turnpike corporation, with the assent of the corporation, procured an act of the legislature, altering the course of the turnpike road, one who, before such alteration, had subscribed for a share and had expressly promised to pay all assessments, was held not to be answerable in an action for the assessments. The court said the plaintiffs rely on an express contract, and they are bound to prove it, as they allege it. Here the proof is of an agreement to pay assessments for making a turnpike in a certain specified direction, and of the making a turnpike in a different direction. The defendant may truly say, *non hæc in fœdera veni*. He was not bound by the application of the directors to the legislature for the alteration of the course of the road, nor by the consent of the corporation thereto. Much fraud might be put in practice under a contrary decision. The same doctrine is maintained by the same court in the subsequent case of the Middlesex Turnpike Corporation v. Swan, (11 Mass. 393.) In the case of the Hartford & New Haven Railroad Co. v. Croswell, (5 Hill, 383,) the Supreme Court of New York held that, if a corporation procure an alteration to be made in its charter, by which a new and different business is superadded to that originally contemplated, such of the

stockholders as do not assent to the alteration will be absolved from liability on their subscriptions to the capital stock, especially if the alteration be one plainly prejudicial to their interests. In this case, the court remarked: " It is most obvious, if incorporated companies can succeed in establishing this sort of absolute control over the original contract, entered into with them by the several corporators, there is no limit to which it may not be carried, short of that which defines the boundary of legislative authority. The proposition is too monstrous to be entertained for a moment. Corporations possess no such power. The original charter is the fundamental law of the association, the constitution which prescribes limits to the directors, officers and agents of the company not only, but to the action of the corporate body itself, and no radical change or alteration can be made or allowed by which new and additional objects are to be accomplished, or responsibilities incurred by the company so as to bind the individuals composing it, without their assent." In New Hampshire, in the case of the Proprietors of the Union Locks & Canals v. Towne, (1 New Hamp. 44,) it was determined where an individual had contracted to take a share in a corporation created for the purpose of making a river navigable, and empowered to hold real estate not exceeding six acres, and to collect a toll forty years, not exceeding twelve per cent. per annum on the amount of money expended, and afterwards, the legislature, upon the petition of the corporation, but without the assent of the individual, authorized them to hold real estate to the amount of one hundred acres, and to collect a toll unlimited as to its amount and duration, that the individual was discharged from his contract and not liable for any subsequent assessment on the share. The court observed, the opinion being delivered by Judge Woodbury, " that, to make a valid change in this private contract, as in any other, the assent of both parties is indispensable. The corporation, on one part, can assent by a vote of the majority; the individual on the other part, by his own personal act. However the corporation then may be bound by the as-

sent to the additional acts, this defendant, in his individual
capacity, having never consented to either of them, is under
no obligation to the plaintiffs except what he incurred by be-
coming a member under the first act. Consequently, the as-
sessments sued for, if raised to advance objects essentially dif-
ferent from those originally contemplated, are not made in
conformity to the defendant's special contract with the corpo-
ration; and this action, sustainable on that contract alone,
cannot be supported." In Georgia, in the case of Winter v.
The Muscogee Railway Co. (11 Ga. 450,) it was decided that,
" where a charter was granted to build a railroad between cer-
tain points, and the defendant subscribed for shares of stock,
and afterwards the charter was amended by changing one of
the termini of the road, running it in a direction different from
that contemplated by the original charter, the defendant was
released from the payment of his subscription, as he had not
consented to the alteration." The court said " that corpora-
tions can exercise no power over the corporators beyond those
conferred by the charter to which they have subscribed, except
on the condition of their agreement and consent. That, al-
though alterations may be made in the charter of an incorpora-
ted company, in furtherance of the designs and objects of the
company, yet in all such cases due regard must always be had
to the inviolability of private contracts. The original contract
of the parties can not be materially or essentially altered by an
amended charter, so as to bind subscribers thereto without their
assent." The doctrine maintained in this opinion is recognized
in Illinois, in the case of Barret v. The Alton & Sangamon
Railroad Co., (13 Ills., 508.) On this question similar views
are expressed by the court of Ohio, in the case of The Penn.
& Ohio Can. Co. v. Webb, (9 Ohio, 136) ; also by the court in
Vermont, in the case of Stephens v. Rutland & Burlington
Railroad Co., reported in Wharton's Law Register for Janua-
ry, 1853. The court in Pennsylvania, in the case of the Turn.
Co. v. Phillips, (2 Penn. & Watts, 194,) maintain the same
doctrine; nor do I conceive that there is any thing inconsistent

with the principle therein declared in the subsequent case, in the same book, of Irwin v. The Turnpike Co., 470.

I do not understand that the law in England, in relation to this question, is different from that maintained in the courts of the United States. This may be inferred from the cases of the Midland Great West. Railway Co. v. Gordon, (16 Meeson & Wellsby, 803,) and Davis v. Hawkins, (3 M. & Sel. 488.) I do not consider that the case of Ware v. The Grand Junction Water Works Co., (2 Rus. & Mylne, 470,) contains any thing at variance with the principle above stated. That was no action on a contract. The law applicable to contracts had nothing to do with it. That was an application by the stockholders to a court of Chancery to restrain the corporation from applying to parliament for an enlargement of its powers. Corporations may undoubtedly apply to the legislature for an extension of their powers, but they must take the consequence of such extension when it materially and essentially varies the purposes and objects of the original charter. What redress is it to a party if he is compelled to pay his·money in the first instance, and then to apply to a court for an injunction to restrain its improper application? If collected, it can not be applied to the original purposes of the corporation, for they are materially changed; and so if the company is restrained, it must lie idle in its hands, and if so, it should not be received, as in equity and justice it ought to be returned to the stockholder, as it can not be used for the purpose for which it was agreed to be paid.

In my opinion, the change in the charter was of such a character as justified the subscriber in withholding the payment of his calls, and therefore the judgment should be reversed.