Syllabus.

# Richmond.

## WEST END REAL ESTATE CO. v. CLAIBORNE.

### JANUARY 18, 1900.

1. PLEADING—*General Issue—Special Pleas.*—Special pleas which set up no defence except such as may be made under the general issue are bad, and should be rejected.

2. JOINT STOCK COMPANIES—*Subscription of Minimum Capital.*—Where the minimum capital of a joint stock company has been in good faith subscribed, the subsequent inability of the company to collect calls on some of the subscribers constitutes no defence to an action brought by the company against another subscriber on his contract of subscription.

3. JOINT STOCK COMPANIES—*Minimum Capital—Payment of Assessments.*—It is essential to the organization of a joint stock company that the minimum capital should have been subscribed in good faith; or, if not subscribed in good faith, subscribed under conditions which estop the subscriber from denying his subscription, but it is not necessary that there should have been actual payment of an assessment.

4. STOCK SUBSCRIPTIONS—*Fraud in Procurement—Action by Company.*—A subscription to stock of a joint stock company procured by fraudulent representations is voidable at the election of the subscriber on discovery of the fraud, and such fraud is a good defence to an action by the company on the subscription unless the contract has been subsequently ratified by the subscriber.

5. STOCKHOLDERS—*Notice of Charter and By-Laws.*—A stockholder is bound at his peril to take notice of the charter and by-laws of the company of which he is a member. If he pays any instalment on his stock, or participates in any meetings of the stockholders after the charter is obtained, he is estopped to deny knowledge of its terms and provisions, however much it may vary from his contract of subscription.

6. INSTRUCTIONS—*Evidence to Support.*—Instructions which correctly propound the law should be given when there is evidence which tends to support them.

Opinion.

7. CONTRACTS—*False Representations—Independent Inquiry—Means of Knowledge—Opportunity to Investigate.*—Although the guilty party to a contract obtained by false representations cannot rely upon the fact that the party defrauded might have learned the truth by proper inquiry, yet if the party defrauded institutes inquiry for himself, and ascertains the truth, or if the means of knowledge are pointed out to him and an opportunity is given to make the necessary investigation, and he thereby acquires some information concerning the actual facts, he cannot rely upon the falsity of such representations.

8. CONTRACTS — *Fraud in Procurement—Disaffirmance—Promptness.*—A contract obtained by fraud is not void, but voidable only, and to be relieved of its consequences, the party defrauded must promptly disaffirm it on learning of the fraud. If he continues to act as if the contract were still subsisting, after knowledge of the fraud, he will be deemed to have waived objection on that account.

9. CONTRACTS—*Fraud—Disaffirmance—Delay—Injury to Guilty Party.*— The duty to promptly disaffirm a fraudulent transaction is not dependent upon proof of injury, by the delay, to the other party.

10. CONTRACTS — *Fraud—Acquiescence—Promise to Expurgate Fraud.*— Acts of acquiescence or disaffirmance of a contract obtained by fraud do not take away from the innocent party the right to disaffirm, if they were induced by a reasonable expectation on his part that the fraud of which he complained would be expurgated, or an arrangement satisfactory to him made by the other party.

Error to a judgment of the Circuit Court of the city of Richmond, rendered January 6, 1899, in an action of *assumpsit,* wherein the plaintiff in error was the plaintiff, and the defendant in error was the defendant.

*Reversed.*

The opinion states the case.

*Ruffin & Tomlin* and *Geo. P. Haw,* for the plaintiff in error.

*Munford & Anderson,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

In September, 1890, Gilliam and others procured an option for sixty days from Hilliard upon a parcel of land situated in the

city of Norfolk at the price of $65,000. They afterwards associated with themselves the owners of other tracts of land in the said city, all of which parcels were to be sold to a joint stock company, which they proposed to organize. On the 29th of September, 1890, a certificate for the organization of such a company was duly executed by five of the above named parties, and the law upon the subject having been complied with, a charter was granted them by the Corporation Court of Norfolk for the purpose of buying, improving, and disposing of real estate, bonds, notes, and other securities; to purchase, hold, and dispose of personal property; to borrow money, build bridges, wharves, piers, and other structures upon their lands; to guarantee bonds, securities, and credits; to engage in various manufacturing enterprises; and to subscribe to the capital stock of other corporations.

The capital stock of the proposed company was fixed at not less than $175,000, nor more than $300,000, divided into shares of $100 each. The amount of real estate proposed to be held was not to exceed 1,000 acres, either in Norfolk or Princess Anne counties, or the cities of Norfolk and Portsmouth, at any one time. The above mentioned parties, nine in number, were made directors of the company, and from this directory the offices of president, vice-president, secretary, and treasurer were likewise filled.

The order granting the charter is dated 30th September, 1890, and it was lodged in the clerk's office of the Corporation Court on the 3d day of November of that year.

Just before the 29th day of September, a prospectus was prepared and distributed to the public. From this prospectus it appears that the purposes of the company were recited to be " the purchasing, improving, and disposing of several valuable tracts of land in the city of Norfolk," which lands were declared to be the Hilliard property, estimated at $126,000; 275 lots in Atlantic

City, stated to be worth not less than $350 apiece, and 220 feet on the harbor, valued at $15,000 or $20,000.

The prospectus further recites: "It is obvious from the above figures that the company's properties will be very cheap at the prices at which they are obtained. They stand the company only $175,000, while their present value, as shown above, is nearly $250,000, with the strongest probability of a large and rapid advance in the immediate future."

The prospectus further recites that the capital stock has been "fixed at $175,000, divided into shares of $100 each, subscription to stock payable as follows: Five *per cent.* at the time of subscription; ten *per cent.* upon the organization of the company; ten *per cent.* at the expiration of six months from the organization of the company, and ten *per cent.* every six months thereafter until the stock has been paid."

In October, 1890, H. W. Claiborne was approached by one Chalmers, agent for the company, and solicited to become a subscriber to its stock. Before making the subscription Claiborne asked the agent if there was any promoter's interest in the undertaking, and, on being assured that there was not, he subscribed to twenty shares, paying in cash the five *per cent.*, as required by the prospectus, and affixing his name to a copy thereof.

On the 1st of November, 1890, Gilliam, one of the corporators, obtained a deed from Hilliard to a parcel of land situated in Norfolk for a consideration of $65,000, $6,500 being paid in cash, the balance to be paid in nine equal instalments, with interest. On the same day he conveyed this property to a trustee to secure Hilliard; and on the same day conveyed the same parcel of land to the West End Real Estate Company, the consideration being $9,500 in cash, and $27,500 in four equal instalments, payable in 6, 12, 18, and 24 months, and the assumption by the company of the obligation to pay Hilliard the deferred payments, amounting to $58,500.

The deeds from Hilliard to Gilliam, and the deed of trust from

Gilliam to Hilliard to secure the deferred payments, were both acknowledged on the 1st of November, and admitted to record on the 14th of November, 1890.

The deed from Gilliam conveying the property to the West End Real Estate Company was executed on the 1st of November, acknowledged on the 5th of December, 1890,- and admitted to record on the 17th of March, 1892. The order of the Judge of the Corporation Court of the City of Norfolk incorporating the company was recorded in the clerk's office of the Corporation Court on the 3d of November, 1890, and was duly transmitted to the Secretary of the Commonwealth for recordation on the 7th of November. On the 10th of November the first meeting of the stockholders was held, and the by-laws were adopted. At the date of this meeting, in accordance with the terms of his subscription, Claiborne paid ten *per cent.* upon his twenty shares of stock, and on May 10 and November 10, 1891, he paid other calls of ten *per cent.* each, making a total paid by him upon his shares of $700. On the 10th of May, 1892, another call was made, but in the meantime Claiborne's suspicion had been aroused as to a promoter's interest in connection with the Hilliard tract of land, and he wrote the officers of the company with respect to it, and demanding also to know if any meeting of the stockholders would be held, and why there had been no general meeting of the company since its organization. In reply he received a letter from the secretary of May 13, 1892, in part as follows:

"Referring to your question as to the original cost of the property, Thomas H. Gilliam, who has been the confidential clerk of Judge Hilliard for eight or ten years, purchased from Judge Hilliard what is known as Hilliard's Point, for $65,000, in September, 1890. In November, 1890, he sold it to our company for $95,000, agreeing to take and place $36,000 worth of the stock, which was done. The rest of the property was at original

prices, with no promoter whatever, and consists of 282 lots in Atlantic City Ward, Norfolk, at the price of about $270 per lot, to the company."

With this letter was enclosed a notice of a called meeting of the stockholders of the company to be held on the 30th of June. Claiborne attended this meeting, and announced that unless the promoter's interest was eliminated he would demand a cancellation of his subscription; whereupon Myers, one of the directors as well as one of the promoters of the company, stated that he would visit Richmond in the near future and adjust the matter to the satisfaction of Claiborne and other Richmond stockholders. Relying, as he claims, upon this assurance, Claiborne decided to continue his payment upon the stock, and to honor the call made on the 10th of May; and in reply to a letter from the treasurer, dated August 5, 1892, informing Claiborne that he would draw for the amount of that call, Claiborne wrote directing him not to draw, but that he would remit the amount the latter part of the month. Myers failed to visit Richmond, and Claiborne refused to pay the call of May 10th. No meeting of the stockholders was held, and no other call made upon him until in the summer of 1898, when a demand was made for the balance alleged to be due upon his stock, and in default of payment suit was instituted.

To the declaration filed in this suit, defendant pleaded *non-assumpsit*, the statute of limitations, and four special pleas in writing.

The first special plea sets up that by the charter of the proposed company the minimum capital stock was $175,000, and that Claiborne's subscription was made on condition that *bona fide* subscriptions to this amount should be obtained, but that there had not been at any time *bona fide* subscriptions to the necessary amount of the capital stock of the proposed company.

The second plea is that he was informed by the agent of the company that the whole of the proceeds arising from the capital

stock of the company was to be used for the payment and improvement of certain real estate, which statement he had ascertained was not true, but that $30,000 had in advance been agreed to be paid to certain promoters of the company, and but for this false representation he would not have subscribed.

The third plea is that he did not subscribe to the capital stock of the company for the purpose set out in the charter of the plaintiff, but that his subscription was for stock in the corporation represented to him to be formed for the purpose of purchasing, holding, and improving certain real estate set out and described in the prospectus of the company.

The fourth special plea is an equitable plea of set off under the statute, stating the amount of damage sustained, and is free from objection.

Pleas one, two, and three are bad, and should have been rejected. If the facts relied upon in them constitute a defence to this action, they could have been proved under the plea of *non-assumpsit;* and the same is true of pleas Nos. 6 and 7. The only proper pleas were those of *non-assumpsit,* the statute of limitations, plea No. 5, which is the special plea of the statute of limitations on contracts not in writing, and No. 4, which, as we have already said, is free from objection.

Upon the trial there was a judgment for the defendant against the plaintiff for $700, the amount of the subscriptions which had been paid.

During the progress of the trial, Claiborne, a witness in his own behalf, was asked by counsel for plaintiff: " Did you ever make any effort to ascertain whether the representations made to you by Chalmers that there was no promoter's interest was true or false? " To this question defendant objected, and the court refused to permit it to be asked, " although the plaintiff felt assured and expected to prove by his answer that the defendant had made no effort whatever to ascertain the truth or falsity of the statement." To this ruling the plaintiff in error excepted.

We think there was no error in excluding the question, for reasons which will be given as we proceed with this opinion.

The instructions given and refused constitute the principal subject of contention before us. They are very numerous and very long, but it will be necessary to copy them at large into this opinion. They are as follows:

" 1. The court instructs the jury that if they find from the evidence that on November 10, 1890, there were *bona fide* subscribers to the capital stock of the plaintiff company to the amount of $175,000, then the entry made by the treasurer of the company on the books of said company under date of November 10, 1893, of $10,400 of said stock standing in the names of Henry Little and others, part of which marked ' stock not issued,' and part ' turned into company,' is not a defence that can be availed of in this cause, and the jury must find for the plaintiff on special plea No. 1."

" 2. That if they find that the defendant was induced to subscribe by the statement of the plaintiff company or its agent, that there were no promoter's profit, when in point of fact there were such profits, that it became the duty of the defendant to elect on the discovery that there were such profits to rescind his contract of subscription or else he was bound by it, and they must find for the plaintiff on special plea No. 2."

" 3. That if they find that the defendant, after discovery that there were such profits, treated the contract of subscription as a subsisting contract, they must deem that the defendant waived his right of repudiation, and that a promise to pay a call after such a discovery is an act showing that he did treat the contract as a subsisting contract, and is a waiver of his right to repudiate it, and they must find for the plaintiff on special plea No. 2."

" 4. That if they find from the evidence that the defendant, prior to actual knowledge of said promoter's profits had the means of knowledge or discovery of said profits in his power,

they must deem that he knew of it at the time that he had such means of knowledge, and they must find for the plaintiff on special plea No. 2."

" 5. That if they find that the defendant knew of said promoter's profits before or on June 30, 1892, and appeared at a stockholders' meeting of said company on that day as a stockholder, and took part in proceedings, such action on his part was an acquiescence in the receipt by said promoters of said profits, and he could not thereafter, because of said profits, repudiate his contract of subscription, and they must find for the plaintiff on special plea No. 2."

" 6. The court further instructs the jury that the capital stock of the plaintiff company constitutes a fund for the payment of its obligations; that if there be a surplus after said obligations are discharged, said surplus belongs to the stockholders; that the defendant herein owed it to all persons dealing with said plaintiff company, and trusting to its financial responsibility, to all persons who, after he discovered there was a promoter's profit, paid their subscriptions, and to the plaintiff company itself, to act diligently to discover said promoter's profit and, when discovered, to act with promptness in ending his obligation as a stockholder, if he intended to end it, and that if he did not act with such promptness in forcing a rescission of his contract, then they must find for the plaintiff on special plea No. 2."

" 7. The court further instructs the jury that if they find from the evidence that the charter of the plaintiff company was lodged for record in the office of the Secretary of the Commonwealth of Virginia, on November 6, 1890, then the defendant was bound to take notice of it in any dealings he thereafter had with said plaintiff company, and that if he paid any instalment on his stock thereafter, or participated in a stockholders' meeting thereafter, he is thereby estopped from denying knowledge of the terms and provisions of said charter, however much said charter varied from his contract of subscription, and that he

thereby ratified and acquiesced in said charter, and cannot now avail himself of any such variance, and they must find for the plaintiff on special pleas 3, 4, 5, 6."

" 8. That if they find that the property of the plaintiff company was bought not for permanent holding, but was of a speculative character, or subject to contingencies, and liable to change with the changing business of the country, it was his duty, if his subscription had been procured by fraud and he had discovered it, if he intended to repudiate his contract, to do so at once on discovery of said fraud, and if he did not repudiate it by forcing a cancellation of his shares, and a restoration to him of the money paid by him, he could not do so after waiting for several years, and only when he himself was sued upon his contract of subscription, and they must find for the plaintiff on all the pleas herein."

" 9. That if they find from the evidence that the defendant subscribed for the number of shares in the declaration mentioned, and that said defendant has ratified his contract of subscription, after knowledge and waiver of any defences he may have had, they must find for the plaintiff on all the pleas."

" 10. That if they find from the evidence that the defendant knew of said promoter's profit in 1892, and afterwards, in that year, participated in a meeting of the stockholders of said company, and promised to pay calls on his subscription, he thereby waived any wrong done him, ratified and confirmed his contract, and cannot in this action recover anything from the plaintiff company, and they must find for the plaintiff on special plea No. 2."

" 11. The jury are instructed that this contract of subscription which is sued on in this action, being in writing, signed by the defendant, the plea of the statute of limitations of three years pleaded in this case does not apply, and they should disregard it and find for the plaintiff on that plea."

" 12. The court instructs the jury that if they find from the

evidence that there were $175,000 of *bona fide* subscriptions to the capital stock of said company on November 10, 1890, that it made no difference whether the five *per cent.* on subscription and ten *per cent.* on organization of the company called for by the subscription contract, had been paid by all of the subscribers or not on said 10th day of November, 1890, to make complete the obligation of the defendant to pay his assessment according to said contract of subscription, and they must find for the plaintiff on this plea."

And the defendant asked the following instructions:

" *a.* The court instructs the jury that by the terms of the prospectus and the contract of subscription entered into with the defendant, it was stipulated that the capital stock of the proposed company had been ' fixed at $175,000, divided into shares of $100 each,' subscriptions on same payable ' five *per cent.* at the time of subscription, and ten *per cent.* upon the organization of the company '; and if the jury believe from the evidence that on the 10th of November, 1890, the date of the alleged organization of this company (plaintiff in this suit), there had not been 1,750 shares of stock subscribed for, and five *per cent.* paid on each share at the time of said subscription, and ten *per cent.* on each share on the date of the alleged organization of the company, then they shall find for the defendant on this issue."

" *b.* The court instructs the jury that if they believe from the evidence that at the time the defendant entered into the contract by which he subscribed to twenty shares of stock in a company to be incorporated in accordance with the terms of the prospectus and contract introduced in evidence, it was represented to said defendant, by the party procuring his subscription, that the whole proceeds of the capital stock of said company should be invested in the payment for and improvements of certain real estate, but that in fact it had already been agreed between the parties engaged in procuring the organization of said company to pay over

the sum of $30,000 to said parties as promoters, or otherwise, then said false representation rendered said contract of subscription voidable, at the instance of said defendant, and they must find for said defendant on this issue, unless after full knowledge of the falsity of said misrepresentation, said defendant elected to ratify and confirm his subscription as aforesaid. ' Confirmation must be a solemn and deliberate act. When the original transaction is infected with fraud the confirmation of it is so inconsistent with justice, and so likely to be accompanied with imposition, that the court watches it with the utmost strictness, and does not allow it to stand but on the clearest evidence.' "

" *c.* The court instructs the jury that by the terms of the prospectus and the contract of subscription entered into with the defendant, it was stipulated that the company proposed to be incorporated under said prospectus and contract was one ' for the purpose of purchasing, improving, and disposing of several valuable tracts of land in the city of Norfolk,' and that it appears from the charter of the company, the plaintiff in this suit, that the objects for which the said company, plaintiff as aforesaid, was incorporated, and the location of the real estate authorized to be held, improved, or sold was as follows: ' The amount of real estate proposed to be held by the said company will be such as may be required for the proper conduct of its business in the counties of Norfolk and Princess Anne, Virginia, and the cities of Norfolk and Portsmouth, Va., not exceeding one thousand acres in either place at any one time,' and that the aforesaid provisions of the charter of said company, plaintiff in this case, constitutes a material variance between the purposes and character of the company referred to and set out in said prospectus and contract, and the company subsequently incorporated, and now plaintiff in this suit, that, therefore, the defendant is not liable on his said subscription to the company, plaintiff as aforesaid, and the jury must find for the defendant on this issue."

" *d.* The court instructs the jury that by the terms of the pros-

pectus and the contract of subscription entered into with the defendant, it was stipulated that the company proposed to be incorporated under said prospectus and contract, was one ' for the purpose of purchasing, improving, and disposing of several tracts of land in the city of Norfolk,' and that it appears from the charter of the company, plaintiff in this suit, that the object for which said company, plaintiff as aforesaid, was incorporated, were among others, ' to receive money on deposit, and to pay interest thereon, to invest said money received on deposit or other moneys of the company, or loan the same upon stocks, or any other security, real or personal '; also, ' to guarantee bonds, securities and credits; to engage in various manufacturing enterprises, and to subscribe to the capital stock of other corporations,' and that the aforesaid provision of the charter of said company, plaintiff in this case, constitute a material variance between the purposes of the company referred to and set out in said prospectus and contract, and the company subsequently incorporated, now plaintiff in this suit, and that therefore, the defendant is not liable on his stock subscription to the company, plaintiff as aforesaid, and the jury must find for the defendant on the issue."

" *e.* The court instructs the jury that by the terms of the prospectus and the contract of subscription entered into with the defendant, it was stipulated that the capital of the company proposed to be incorporated under said prospectus and contract, was ' fixed at $175,000, divided into shares of $100 each,' and that it appears from the charter of the company, plaintiff in this suit, that ' the capital stock of said company is not to be less than $175,000, nor more than $300,000, to be divided into shares of $100 each; and that the aforesaid provisions of the charter of said company, plaintiff in this suit, constitute a material variance between the purposes and character of the company referred to and set out in said prospectus and contract, and the company subsequently incorporated and now plaintiff in this suit, and that, therefore, the defendant is not liable on his stock subscription

to the company, plaintiff as aforesaid, and the jury must find for the defendant on this issue."

" *f.* The court instructs the jury that if the plaintiff relies either upon ratification by the defendant of his alleged contract of subscription, after knowledge of the false representations and of the variations between the provisions of the charter of the company proposed to be incorporated under the terms of the prospectus, and the charter of the company actually incorporated and now plaintiff in this suit, then the burden of showing such knowledge as ratification is upon the plaintiff.  And they are further instructed that if the plaintiff seeks to rely upon the alleged laches or delay of the defendant in demanding a rescission of the contract, after knowledge of the false representations referred to in his second special plea, and in instruction " B," then the burden is upon the plaintiff not only to establish said laches, but to show that the creditors, or innocent third parties, or the plaintiff itself, has been injuriously affected by the defendant's delay.  And the jury are further instructed that if they believe from the evidence that the defendant, after knowledge of the false representation set out as aforesaid in his special plea No. 2, delayed instituting suit to rescind his contract of subscription on account of any assurances on the part of the officials of said company, that the wrong perpetrated upon said defendant by the payment to the promoters of a portion of the proceeds of the capital stock would be arranged to his satisfaction, or by abandoning the collection of amounts unpaid on his subscription, then the failure of defendant to institute suit cannot constitute laches."

" *g.* The court instructs the jury that if they should fail to find for the defendant under either of the foregoing instructions, they shall then return a verdict in favor of the defendant against the plaintiff company, for any sum or sums which the proof in the case established the defendant as having paid to the plaintiff on account of his subscription to the stock of the company referred

to in the prospectus and contract introduced as evidence in this case, with interest on such payments from the respective dates on which they were made."

The court gave instructions Nos. 2, 7, and 11 asked by the plaintiff, and refused to give instructions Nos. 1, 3, 4, 5, 6, 8, 9, 10 asked by the plaintiff, and gave instructions asked by the defendant, and in lieu of instruction No. 3 asked by the plaintiff, gave the following:

" 3. That if they find that the defendant, after discovery that there were such profits, treated the contract of subscription as a subsisting contract, they must deem that the defendant waived his right of repudiation," and to the action of the court the defendant excepted.

In refusing the first instruction asked by plaintiff in error the Circuit Court seems to have proceeded upon the assumption that even though the minimum capital of the company had been subscribed in good faith at the time of its organization, the company would be incapacitated to recover unpaid subscriptions to its stock if it should be made to appear that shares of stock necessary to constitute the minimum capital " had not been issued," or had been, for any cause, " turned into the company." We do not understand this to be the law. The instruction assumes that the minimum capital had been in good faith subscribed, and that fact being established to the satisfaction of the jury, the subsequent inability of the company to collect a part of it in accordance with the terms of the subscription, constituted no defence to the action against Claiborne.

Instruction marked " a," given at the instance of the defendant, is the converse of this proposition, and shows clearly the view of the law entertained by the trial court. The prospectus fixes the minimum capital at $175,000, all of which had been subscribed, but upon a part of which the amount due at the time

of the subscription and upon the organization of the company had not been paid, and for that cause the jury were instructed to find for the defendant. It was, of course, essential to the organization of the company that there should have been subscriptions made in good faith to the amount of the minimum capital stock; or if not made in good faith, should have been subscribed under conditions which would have operated as an estoppel upon the subscriber (*Wilson* v. *Hundley*, 96 Va. 103), but it was not necessary that there should have been actual payment of the assessment. 1 Cook on Stock & Stockholders, sec. 176-177. We have seen no authority for the proposition that the failure of a subscriber to pay an assessment upon the stock taken by him can be pleaded as a defence by himself or another subscriber in a suit brought for the residue of their subscription. On the contrary, " the decided weight of authority and the most carefully considered cases hold that a subscriber for stock cannot escape the responsibilities of a stockholder by showing that he never paid the percentage or amount required by the charter or statute to be paid at the time of subscribing. He will not thus be permitted to take advantage of his own wrong and default to the prejudice of others. In some instances the percentage was paid in notes or checks instead of cash; in others payment in cash was made at some period subsequent to the act of subscribing; in still others, no payment at all was made on the subscription, and suit was brought for the whole amount." 1 Cook on Stock & Stockholders, sec. 173; *Wilson* v. *Hundley, supra.*

Instruction numbered 1 asked by plaintff in error should have been given, and instruction " a " asked by defendant in error should have been refused.

Instruction " b " correctly states the law.

Instructions " c," " d," and " e " granted at the instance of defendant in error, proceeded upon the idea that the variance between the terms of the prospectus shown to the defendant in in error, and by which he was induced to subscribe, and the

charter as subsequently granted by the court, constitute a defence to this action. The court had already given, at the instance of the plaintiff in error, instruction No. 7, by which the jury were told that " if they found from the evidence that the charter was lodged for record in the office of the Secretary of the Commonwealth the defendant was bound to take notice of it in any dealings he thereafter had with the plaintiff company, and that if he paid any instalment on his stock thereafter, or participated in a stockholders' meeting, he was estopped to deny knowledge of the terms and provisions of the charter, however much it varied from his contract of subscription, which is a correct statement of the law. Not only is a stockholder bound at his peril to take notice of the charter of the company of which he is a member, but of its by-laws also. *Nat'l Mutual B. & L. Ass'n* v. *Ashworth*, 91 Va. 706; *Nickels* v. *People's B. L. & S. Ass'n*, 93 Va. 380.

We do not deem it necessary to discuss in detail other instructions given and refused. A common principle seems to pervade them.

There is evidence to the effect that Claiborne was assured by the agent of the company that there was no promoter's fund. There is evidence to the effect that after he had been informed there was a promoter's fund, he did acts tending to ratify and confirm his subscription. There is evidence tending to show that these acts of ratification on his part were induced by the reasonable expectation that the company would eliminate from the transaction the injury done by the payment to the promoter's fund of a portion of the proceeds of the capital stock, and would arrange that matter to his satisfaction; and the law covering these propositions should have been presented to the jury.

Where it is established that there has been any fraudulent representations by which a person has been induced to enter into a contract, " it is no answer to his claim to be relieved from it to tell him that he might have known the truth by proper inquiry.

He has a right to retort upon his objector, ' You, at least, who have stated what is untrue, or have concealed the truth for the purpose of drawing me into a contract, cannot accuse me of want of caution because I relied implicity upon your fairness and honesty.' " *Central R. Co.* v. *Kisch,* L. R. 2 H. L. 99, 120; *Reynell* v. *Sprye,* 1 D. M. G., at p. 710; *Price* v. *McCauly,* 2 D. M. G. 339-346; and Pollock's Principles of Contract, 487-8.

The principle is equally well settled, but somewhat more difficult of application in practice, that a party induced to enter into a contract by misrepresentation must be justified in relying upon it under all the circumstances. If, after a representation of fact, however positive, the party to whom it was made institutes an inquiry for himself, has recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentaion and to have been misled by it. Such claim would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports, or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled. 2 Pomeroy's Eq. Jur., sec. 893.

But mere opportunity or means of obtaining knowledge is not enough where there has been an antecedent representation of fact upon which a party has been induced to rely to his prejudice. " Mere opportunity or means of investigation are not sufficient in such a case. Undoubtedly, if there had been no representation, they (that is the opportunity or means of knowledge) might or would have put the party upon inquiry, and would, therefore, amount in law to a constructive notice of the facts which might

have been learned by such inquiry; but the positive representation of a fact cannot be counteracted by such implication. It must be shown that the party proceeded, in some measure, to avail himself of the opportunity—that he took some steps in making an independent investigation— * * * In other words, it must appear that, through the opportunity and means of inquiry, he received *some* information concerning the actual facts, so that, from considerations of expediency, he should not be allowed to allege his failure to obtain *all* the knowledge which he might have acquired." Sec. 895.

A contract tainted with fraud is not void, but voidable. Therefore, great punctuality and promptness of action are required by the deceived party upon his discovery of the fraud. " The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to· their original positions. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission, or a refusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations." ˙ Sec. 897. And this duty promptly to disaffirm a fraudulent transaction is not dependent upon the proof of injury by the delay to the other party.

Conceding, for the sake of argument, that there was a fraudulent representation in the case before us; that there was evidence of the ratification of the transaction after knowledge of that fraud, it would still remain to consider whether or not the affirmance or acquiesence was induced by a promise upon the part of the company, or its agents, to expurgate the fraud and its con-

sequences from the transaction and make an arrangement with respect to it satisfactory to the defendant.

The jury should have been told that the acts of acquiescence or affirmance relied upon by the plaintiff did not prejudice the defendant if induced by the reasonable expectation upon his part that the fraud of which he complained would be expurgated, or an arrangement satisfactory to him made with respect to it. See *Strickland* v. *Graybill*, 1 Va. S. C. R., at p. 620.

The third instruction asked by plaintiff in error should have been given with the qualification appended that the acts of affirmance were not induced by any such promise or undertaking upon the part of the plaintiff in error.

We are of opinion that the judgment should be reversed.

*Reversed.*