# Richmond

## WATTERS & MARTIN, INC., v. HOMES CORPORATION.

### March 22, 1923.

1. STOCK AND STOCKHOLDERS—*Subscription—Variance Between Prospectus and Charter.*—In the absence of assent, express or implied, any material variance between the prospectus and subscription agreement of the proposed corporation and the charter subsequently granted releases the subscribers to the stock from their subscriptions. Any material change in the plan or purpose for which the subscription was made cannot be effected without the consent of the subscriber. He is thereby released, unless there has been a waiver, or unless he has estopped himself to deny his consent to the change.

2. STOCK AND STOCKHOLDERS—*Subscription—Variance Between Prospectus and Charter—Real Estate and Building Business—Case at Bar.*—In the instant case, an action by a corporation to recover on a subscription to its stock, the prospectus of the corporation stated the purpose of the organization of the company to be to engage in the real estate and building business generally, and that two of its objects were to construct homes for people of limited means and "effect an economy and profit by the consolidation of the services of real estate operator, lawyer, architect, builder, material man and banker, under one organization, and derive substantial profit from production in volume." An examination of the provisions of the charter disclosed no language which gave the corporation any powers not expressly mentioned, or which the law would not imply as incidental to an express grant of powers set out as purposes in the prospectus.

   *Held:* That there was no material variance between the charter and the prospectus sufficient to release subscribers.

3. STOCK AND STOCKHOLDERS—*Subscription—Variance Between Prospectus and Charter—Case at Bar.*—Not every variance of the charter from the prospectus of the corporation will release a subscriber. Thus, a mere enlargement of the powers of the corporation, without materially changing its original purposes, will not release a stockholder from his original obligation. A general grant of power to do a particular thing carries with it, by implication, whatever may be found necessary to render the power granted effectual. And in the instant case, if the charter as actually granted had contained, as powers granted the corporation, a verbatim copy of the purpose and objects,

as set out in the prospectus, all additional powers which are actually contained in and granted by the charter would have been implied by law to be reasonably necessary to render the granted powers effectual to their fullest extent.

4. STOCK AND STOCKHOLDERS—*Subscription—Variance Between Prospectus and Charter—Ratification by Subscriber.*—A subscriber to stock in a corporation who by duly authorized proxy attended the first meeting of the incorporators and subscribers of the corporation, at which the charter was read and accepted, officers and directors elected, and by-laws adopted, and who took part in all the business transacted, ratifies the charter and cannot rely upon a variance between the charter and the prospectus as a release from his subscription obligation.

5. STOCK AND STOCKHOLDERS—*Promoters—Violation of "Blue Sky Law"— Case at Bar.*—The "blue sky law" of the State of Virginia (Acts 1918, p. 676) makes it unlawful to sell or offer for sale "speculative securities," until and unless certain conditions are met and permits granted, and Acts 1920, p. 536, defines speculative securities. In the instant case the capital stock of the corporation was fixed at $750,000, of which $250,000 was preferred and the remaining $500,000 common stock. The prospectus and subscription agreement provided that one-half of the common stock was to be retained by the organizers for their services.

*Held:* That the sale of the stock of this corporation, without complying with the requirements of the act, was a violation of the "blue sky law."

6. STOCK AND STOCKHOLDERS—*Promoters—Effect of Violation of "Blue Sky Law" on Validity of Subscriptions to Stock.*—A violation of the "blue sky law" of Virginia (Acts 1918, p. 676, amended by Acts 1920, p. 536) by promoters does not render contracts of subscribers unenforceable.

7. STOCK AND STOCKHOLDERS—*Promoters—Object of "Blue Sky Law."*—The object and purpose of the act is to prevent unfairness, imposition or fraud in the sale of certain securities therein mentioned, by inspecting and regulating the business of those engaged or intending to engage in the sale or disposition of such securities and by prescribing penalties for the violation thereof.

8. ILLEGAL CONTRACTS—*Violation of Statute—General Rule.*—The general rule of law is that a contract made in violation of a statute is void, and that when a plaintiff cannot establish his cause of action without relying upon an illegal contract he cannot recover.

9. ILLEGAL CONTRACTS—*Violation of Statute—Exceptions to General Rule.*— To the general rule that a contract made in violation of a statute is void there are exceptions, based upon a supposed intent of the legislature. The courts should always look to the language of the statute, the subject matter, the wrong it seeks to prevent, and the purpose to be accomplished in its enactment; and if from these it is manifest that

it was *not intended* to render the act in contravention of the statute void, the courts will so hold.

10. Illegal Contracts—*Violation of Statute—Exceptions to General Rule—Virginia "Blue Sky Law."*—Upon the question of whether a contract made in violation of a statute is void, the intent of the legislature, as disclosed by the act, must govern. When tested by this rule, the Virginia "blue sky law" (Acts 1918, p. 676) shows legislative intent not to make void and unenforceable contracts entered into in violation of its provisions. A consideration of the entire statute shows that the real purpose of the act was to give the Corporation Commission the *power to regulate the sale* of certain securities and to require the promoters of such securities to honestly apply the proceeds of sale thereof, as far as may be necessary to prevent unfairness, imposition, and fraud.

Error to a judgment of the Circuit Court of the city of Norfolk, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Roper, Bowden, Cochran & Sands*, for the plaintiff in error.

*Tazewell Taylor*, for the defendant in error.

West, J., delivered the opinion of the court.

Homes Corporation brought action against Watters & Martin, Incorporated, on a subscription to its capital stock made before the organization of the corporation, and recovered a judgment for $5,000.00, the amount of the subscription agreement, with interest. To that judgment this writ of error was awarded.

In the summer of 1919 there was a scarcity of houses in and around Norfolk, Virginia. To relieve the situation a goodly number of the leading citizens held a con-

ference and appointed a special committee to report in regard to the formation of a corporation which would increase the facilities for housing the excess population. The special committee reported to the general committee a prospectus for the establishment of a proposed corporation, and on August 28, H. W. Davis, one of the promoters and organizers of the plaintiff corporation, submitted a plan including the prospectus and subscription agreement on which the plaintiff corporation was subsequently chartered. Before the charter was granted subscriptions were solicited for stock of the proposed corporation, and after examining the prospectus and financial plan the defendant company, acting through J. H. Watters, its president, signed a subscription agreement, of which the prospectus and financial plan formed a part, subscribing fifty shares of the preferred stock of the plaintiff corporation. This agreement was signed early in September, 1919. No cash payment was required, assessments being subject to call by the board of directors of the plaintiff corporation after its formation. The defendant company, a few days after the subscription contract was signed, attempted to withdraw its subscription through Rufus Parks, who was not authorized to act for the corporation in such matters. Shortly thereafter, on or after September 17, the defendant company, acting by its president, executed a paper appointing L. T. Dobie, Richard B. Tucker and Otto Wells, or any one of them, as its proxy, with full power to vote for and on behalf of the defendant company the said fifty shares of the preferred capital stock of the plaintiff corporation at the first meeting of the incorporators and subscribers to the capital stock of the said corporation, held September 29, 1919. At this meeting the charter obtained for the plaintiff corporation was read and adopted, officers and directors elected, by-

laws adopted, issuance of certificates of capital stock authorized, the directors authorized to levy an assessment on the subscription agreements, a corporate seal adopted, and other business transacted.

L. T. Dobie, proxy for the defendant company, was present and voted its stock upon all questions passed upon in the meeting.

On November 20, 1919, December 18, 1919, January 20, 1920, February 6, 1920, February 17, 1920, and February 23, 1921, letters were written by the plaintiff corporation to the defendant company notifying it of the levy of an assessment on the stock subscriptions, and requesting a remittance. No reply was made to either letter. Thereupon this suit was instituted, resulting in judgment for the plaintiff for $5,000.00, as aforesaid.

The position of the plaintiff in error, called the defendant, is that the defendant in error, called the plaintiff, is attempting to compel the defendant to pay for the stock of a corporation with purposes other and powers greater than, and essentially different from, those of the proposed corporation as set forth in the prospectus and subscription agreement; and that the prospectus and subscription agreement were a violation of the blue sky law (Laws 1918, C. 408), and therefore void.

The plaintiff contends that there is no material variance between the prospectus and charter as granted sufficient to release subscribers to the prospectus; that if such variance exists the defendant has expressly or impliedly ratified the charter as granted; that the blue sky law has not been violated, and even though violated such violation does not render the subscription agreement unenforceable.

The defendant relies on eight assignments of error, but they may be disposed of in the discussion of the following questions:

1. Is there a fundamental and material variance between the prospectus of the plaintiff corporation and its charter sufficient to release non-assenting subscribers?

2. Has the charter granted been accepted by the defendant company?

3. Did the sale of securities of the plaintiff corporation involve a violation of the blue sky law of Virginia?

4. Does a violation of the blue sky law by promoters render contracts of subscribers unenforceable?

(a) *Variance between prospectus and charter.*

[1-3] It is agreed that in the absence of assent, express or implied, any material variance between the prospectus and subscription agreement of the proposed corporation and the charter subsequently granted releases the subscribers to the stock from their subscriptions.

Any material change in the plan or purpose for which the subscription was made cannot be effected without the consent of the subscriber. He is thereby released, unless there has been a waiver, or unless he has estopped himself to deny his consent to the change. 37 Cyc. 495, and cases cited.

We give below in parallel columns the material portions of the charter of the Homes Corporation and the prospectus and subscription agreement of said corporation, as follows:

"PROSPECTUS OF HOMES CORPORATION.

To be organized by: H. M. Kerr, F. R. Harris; A. W. Cornick, Maurice Long, and Hugh W. Davis, hereinafter called the 'organizers.'

ORGANIZATION.

This company is to be organized under the laws of Virginia, with a

"III.    CHARTER PURPOSES.

The purposes for which this corporation is formed are:

1.   To purchase, improve, develop, lease, exchange, sell, dispose of and otherwise deal in and turn to account, real estate;

2.   To purchase, lease, build, construct, erect, occupy and manage buildings of every kind and character whatsoever;

maximum authorized capital stock of $750,000.00, FOR THE PURPOSE of engaging *in the real estate and building business.*

### OBJECT.

1. To encourage building improvements of a character and in a manner to preserve the present growth of the city of Norfolk, and to this end:

2. To provide a prompt, efficient and economical method for the construction of homes for people of limited means.

3. To establish at once an organization which will enable a prospective homeowner, having only a small amount of cash, to obtain at a reasonable price, the necessary land, building and financing under one contract made in advance with this company.

4. To effect an economy and profit by the consolidation of the services of real estate operators, lawyers, architect, builder, material man and banker, under one organization, and derive substantial profit from production in volume.

### CAPITAL.

It is estimated by the organizers that a cash capital of $250,000.00 is sufficient to provide 1,000 additional homes at the rate of not less than 500 per annum.

It is estimated that these homes will not only fill a pressing public need, but also realize a handsome profit to the investors.

3. To finance the purchase, improvement, development and construction of land and buildings belonging to or to be acquired by this company, or any other person, firm or corporation. In furtherance and not in limitation of the powers conferred by law, this corporation shall have power:

1. To act as broker, agent and auctioneer in the sale and purchase of real estate;

2. To guarantee titles to real estate;

3. To make, issue and provide buildings and improvements, plans and specifications and to contract for and superintend construction work of every kind and character whatsoever;

4. To purchase, sell, deal in and turn to account building material of every kind and character whatsoever;

5. To guarantee and become surety, with respect to the notes, bonds or other obligations of other companies, and to purchase, sell and exchange the notes, bonds, and other obligations of any person, firm or corporation;

6. To subscribe to, purchase or otherwise acquire, and to guarantee or become surety in respect to the stock, bonds or other securities and obligations of other companies now or hereafter organized for the purpose of acquiring, owning, maintaining or operating any real or personal property or any works or improvement, of incidental benefit and advantage to this company, or any property owned by it or by any other company whose securities are held by this company; and in particular,,

### FINANCIAL PLAN.

Of the capital stock to be issued, one-third shall be preferred stock and two-thirds shall be common stock; all to be of the par value of one hundred dollars ($100.00) per share and to have equal voting power; the purchasers of the preferred stock to receive, as a bonus, one-half of the common stock (share for share) from the organizers, and the remaining one-half of the common stock to be retained by the organizers for their services as such."

any sewerage, drainage, water supply, telephone, lighting, gas, road building, street improvement, ice making or refrigerating works or company;

7. To subscribe to, purchase or otherwise acquire bonds or other securities and obligations of the State of Virginia, or any county, city or incorporated town thereof;

8. To offer for public or private subscription the securities, including stock, bonds and other obligations, which the company is authorized to acquire, and otherwise to establish, promote and aid in establishing and promoting any company, association, undertaking or public or private body to be organized for any of the purposes hereinabove mentioned;

9. To aid in any manner any corporation, association, or individual of which any bonds or other securities or evidence of indebtedness, or stock, are held by this company, and to do any act or thing designed to protect, preserve, improve or enhance the value of any securities or other property held by this company.

A careful examination of the provisions of the charter granted the plaintiff corporation discloses no language which gives to the corporation any powers not expressly mentioned, or which the law would not imply as incidental to an express grant of powers set out as purposes in the prospectus. It will be observed that the prospectus states the *"purpose"* of the organization of the company to be *to engage in the real estate and building business*, generally, and that two of its "objects" were to construct homes for people of limited means and "effect an economy and profit by the consolidation of the services of real estate operator, lawyer, architect, builder,

material man and banker, under one organization, and derive substantial profit from production in volume."

From a casual reading of the prospectus a person of average intelligence must have understood that the proposed corporation would be authorized by its charter to engage in the real estate and building business on a large scale. The *purposes* for which the corporation was formed, as stated in the charter, are in harmony with the *purpose* as stated in the prospectus; and the powers granted under paragraph 3 of the charter, *supra*, "in furtherance and not in limitation of powers conferred by law," are such as are usually incident to and exercised by persons conducting a large and well regulated real estate and building business.

In a note to *Franklin Glass Co.* v. *Alexander* (N. H.); 9 Am. Dec. page 100, the law is stated thus: "The difficulty is in the application of the rule to determine what is a material alteration such as will release a subscriber. Not every alteration or change will effect this, for a mere enlargement of the powers of the corporation without materially changing its actual purposes, will not release a stockholder from its original obligation. Citing *Peoria, etc., R. R.* v. *Preston,* 35 Iowa 115; *Sprague* v. *Illinois R. R.,* 19 Ill. 174; *Pacific R. R.* v. *Hughes,* 22 Mo. 291."

In *Newport News Shipbuilding & Dry Dock Co.* v. *Jones,* 105 Va. p. 512, 54 S. E. 317, 6 L. R. A. (N. S.) 247, this court said: "The principle is of universal application, and is illustrated by numerous adjudged cases, that in the absence of express restrictions a general grant of power to do a particular thing carries with it by implication, as an essential incident, authority to do whatever may be found reasonably necessary to render the power granted effectual."

If the charter as actually granted had contained, as

powers granted the corporation, a verbatim copy of the purpose and objects, as set out in the prospectus, all additional powers which are actually contained in and granted by the charter would have been implied by law to be reasonably necessary to render the granted powers effectual to their fullest extent.

Our conclusion is that there is no variance between the prospectus and charter as granted sufficient to release subscribers to the prospectus.

(b) *Acceptance of charter by the defendant company.*

[4] In view of what we have said, *supra,* we deem it unnecessary to discuss the question of the acceptance of the charter by the defendant company. If, however, we have erred in our conclusions on the question of variance between the prospectus and the charter, we find no difficulty in holding that the charter was accepted by the defendant company.

The president of the defendant company read the prospectus and financial plan of the corporation before signing the subscription agreement. Later L. T. Dobie, its duly authorized proxy, attended the first meeting of the incorporators and subscribers to the capital stock of the corporation, at which the charter was read and accepted, officers and directors elected, and by-laws adopted, and took part in all the business transacted.

When written to six times, after the charter was adopted, for the payment of an assessment upon the capital stock subscribed by it, the defendant company raised no question as to the validity of its subscription, or a variance between the prospectus and the charter.

In *West End Real Estate Co.* v. *Claiborne,* 97 Va. 734, 34 S. E. 900, this court said: "A stockholder is bound at his peril to take notice of the charter and by-laws of the company of which he is a member. If he pays any installments on his stock, or participates in any meeting of

the stockholders after the charter is obtained he is estopped to deny knowledge of its terms and provisions, however much it may vary from his contract of subscription."

In *Greenbrier Industrial Exposition* v. *Squires*, 40 W. Va. 307, 21 S. E. 1015, 52 Am. St. Rep. 884, the law is stated as follows: "The cases in regard to this point have all been examined and they all agree that where the subscription has been acquiesced in, either by payment of part of the subscription, or by becoming a director, or by attending meetings of stockholders, or by any other act indicating an acquiescence in the validity of his subscription his defense based on mere technical objection will be disregarded." Further at page 311 of 40 W. Va., at page 1016 of 21 S. E., 52 Am. St. Rep. 887, the court said: "Even where articles of association are altered or an attempt is made to transfer a subscription to a new company, the subscriber will be liable if he consented to the change either by word or act indicating acquiescence." Citing *Hammond* v. *Straus*, 53 Md. 1, 16; 1 Morawetz on Private Corporations, section 63. "If any question could arise as to the identity of the corporation organized or the statement in the subscription paper, it must be held to have been waived by the defendant when he appeared at its meeting and took part in the discussion of questions there raised and voted his stock." Citing the opinion in *Association* v. *Walker*, 83 Mich. 393, 47 N. W. 338.

(c) *Alleged violation of the blue sky law.*

[5] Have the promoters of the plaintiff corporation actually violated the "blue sky law" of Virginia? This question must be answered in the affirmative.

The act approved March 23, 1918, commonly known as the "blue sky law" of the State of Virginia (Acts 1918, page 676), makes it unlawful to sell or offer for

sale "speculative securities," until and unless certain conditions are met and permits granted. It is admitted that these conditions were not complied with, nor the required permits secured in this case.

The term "securities" as defined by the act shall be taken to include *stock certificates*, shares, bonds, etc.

"Speculative securities," as defined by the act (as amended by Acts 1920, page 536), include securities for promoting the sale of which a commission of more than seven and one-half per cent. is offered or paid either in money, *stock*, property, or otherwise, either directly or indirectly; also the securities of any enterprise, association, partnership, or corporation, which has included or proposes to include in its assets as a material part thereof, promotion or intangible assets.

The capital stock was fixed at $750,000.00, of which $250,000.00 was preferred and the remaining $500,000 common stock, all of the par value of $100.00, and equal voting power. The prospectus and subscription agreement signed by the defendant company provided that one-half of the common stock, par value $250,000.00, was to be retained by the organizers for their services as such. One-third of the total amount of the capital stock of the corporation certainly formed a material part of its securities (far in excess of seven and one-half per cent. commission), which was to be issued to the promoters for their services. The act specifically makes it unlawful to issue such stock for promotion services, without the permit from the Commission, if such stock is a material part of the assets of the corporation.

It follows that the sale of the stock of this corporation, without complying with the requirements of the act, was a violation of the "blue sky law" of Virginia.

(d) *Effect of a violation of blue sky law upon subscription contracts.*

[6] Does a violation of the blue sky law by promoters render contracts of subscribers unenforceable? This question must be answered in the negative.

[7] The object and purpose of the act is to prevent unfairness, imposition or fraud in the sale of certain securities therein mentioned, by inspecting and regulating the business of those engaged or intending to engage in the sale or disposition of such securities and by prescribing penalties for the violation thereof.

Section 2 of the act (as amended by Acts 1920, page 537) provides: "It shall be hereafter unlawful for any promoter to sell, or offer for sale * * * or, by means of any * * * prospectus, or any other form of public offering to attempt to promote the sale of any speculative securities in this State *until* the said promoter shall have first applied for and secured from the State Corporation Commission, * * * a permit to do so, and no such permit shall be granted until there first shall have been filed with the Commission by the applicant and made a part of such application duly sworn to, etc."

Section 11 of the act provides that any person who shall commit, in whole or in part, in this State, any act declared unlawful by this act, or who shall fraudulently evade or attempt to evade the provisions thereof, shall be guilty of a misdemeanor and upon conviction punished by a fine of $100.00 to $5,000.00, or confinement in jail for not less than thirty days, or more than one year, or both such fine and imprisonment.

[8] The general rule of law is that a contract made in violation of a statute is void; and that when a plaintiff cannot establish his cause of action without relying upon an illegal contract he cannot recover.

Pollock, Principle of Contract, pp. 253, 260; *Penn* v. *Bornman*, 102 Ill. 523; *Alexander* v. *O'Donnell*, 12 Kan. 608; *Bank of United States* v. *Owen*, 27 U. S. (2 Pet.)

527, 539; 7 L. Ed. 508; *Miller* v. *Ammon,* 145 U. S. 421,
12 Sup. Ct. 884, 36 L. Ed. 759; *Pangborn* v. *Westlake,* 36
Iowa 546, 549.

[9] There are exceptions to this general rule, based
upon a supposed intent of the legislature. The courts
should always look to the language of the statute, the
subject matter, the wrong it seeks to prevent, and the
purpose to be accomplished in its enactment; and if
from these it is manifest that it was *not intended* to ren-
der the act in contravention of the statute void, the
courts will so hold. *Pangborn* v. *Westlake, supra; Har-
ris* v. *Runnels,* 12 How. 79, 13 L. Ed. 901.

In *Niemeyer* v. *Wright,* 75 Va. 244, 40 Am. Rep. 720,
it is said: "But it does not follow that the unlawfulness
of the act was meant by the legislature to avoid a con-
tract made in contravention of it. When the statute is
silent, and contains nothing from which the contrary
can be properly inferred, a contract in contravention of
it is void."

[10] The intent of the legislature, as disclosed by the
act, must govern. When tested by this rule, we are
driven to the conclusion that the Virginia blue sky law
shows legislative intent *not* to *make void* and *unenforce-
able* contracts entered into in violation of the provisions
thereof. The act, *as appears* from *its title* was enacted
*to prevent unfairness, imposition and fraud* in the sale or
disposition of certain securities by requiring an inspec-
tion and regulation of the business of those engaged in
or intending to engage in the sale of such securities. In
section 9, subsection f, the legislature excepts certain
classes of securities from the operation of the act. Sec-
tions 18 and 19 of the act read as follows:

"18. This act shall not be construed to prevent the
sale of purely speculative securities, but to give to the
Commission power to require that the promoters of such

securities shall honestly apply the proceeds of the sale thereof to the purpose for which such securities are sold; and to this end the Commission may further require such promoters to place promotion securities in escrow or to give security for the proper and honest application of such funds, as may come into their possession, for another, by reason of such promotion.

"19. (Printed '22'). In the event of the failure of any promoter to comply with any order which the Commission is authorized by this order to make, then it shall be unlawful for such security to be sold until such order is complied with or set aside, as herein provided."

It is manifest that the legislature enacted the statute in the public interest and that to declare contracts made in violation of its provisions unenforceable and void would be an additional means of compelling the observance of the law. But we cannot so hold if the act negatives the intention that such contracts should be so construed. A consideration of the *entire statute* convinces us that the real purpose of the act was to give the Commission the *power to regulate the sale* of certain securities and to require the promoters of such securities to honestly apply the proceeds of sale thereof, as far as may be necessary to prevent unfairness, imposition and fraud. And since it is provided by section 18 that the act *shall not be construed* to *prevent the sale* of purely speculative securities, it is apparent that the legislature intended, not to make void and unenforceable contracts made in violation of its terms, but simply to leave those violating the provisions of the law, or refusing to comply with any order of the Commission, amenable to the penalties and subject to the regulation prescribed by the act.

The plaintiff in error relies with great earnestness upon certain cases from other jurisdictions, where it has been held that the contracts in violation of blue sky

laws of other States are void and unenforceable. While the statutes of those States are in some respects similar to the Virginia blue sky law, none of them, so far as we are advised, contain a provision similar to section 18 of the Virginia statute, nor any other like provision which shows that it was not the intention of the legislature to make contracts in violation of the blue sky law unenforceable and void. In this situation, a review of the authorities relied on would be unprofitable.

For the foregoing reasons we are of opinion that the judgment complained of is plainly right and must be affirmed.

*Affirmed.*

Sims and Burks, JJ., concurring:

We concur in the holding of the majority opinion on the subject of the blue sky law, and also in the holding that, by taking part by proxy in the organization meeting of the stockholders, at which the charter of the corporation was accepted, the defendant company waived all objection to and must be considered as having accepted the charter of the corporation; and, hence, we concur in the conclusion of the majority opinion to affirm the case. But, for reasons stated in the dissenting opinion in the case of *Consolvo & Cheshire* v. *Homes Corporation, post,* page 130, 116 S. E. 371, this day decided, we find ourselves unable to concur in the holding of the majority opinion that there is no material variance between the prospectus, on the faith of the representations of which the stock subscription contract of the defendant company was obtained, and the charter of the corporation afterwards obtained.