## MORGAN v. STRUTHERS.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 234. Argued March 29, 1889. — Decided May 13, 1889.

A contract between A, a subscriber to the stock of a proposed incorporated company, and B, another subscriber to the same, made without the knowledge of the remaining subscribers, by which A agrees to purchase the stock of B at the price paid for it, if at a specified time B elects to sell it, is not contrary to public policy, and can be enforced against A if made fairly and honestly, and if untainted with actual fraud.

THIS was an action of assumpsit, brought in the court below by J. Pierpont Morgan, a citizen of the State of New York, against Thomas Struthers and one Thomas S. Blair, citizens of Pennsylvania, to recover the sum of $26,282.19, with interest, on a certain contract in writing, more particularly described hereafter. The defendant Blair not having been served with process the case proceeded against Struthers alone.

The material facts in the case were substantially as follows: In the year 1873, Thomas Struthers, Thomas S. Blair and Morrison Foster were the owners of certain patents for the manufacture of iron and steel, and also of certain real estate and works erected thereon, to be used for such manufacture, situate in Pittsburgh, Pennsylvania. They then procured an incorporation under the laws of the State of New York, in the name of the "Blair Iron and Steel Company," with a capital of $2,500,000, divided into 25,000 shares of $100 each, the stock being paid up in full by a transfer to the company of the patents and the works at Pittsburgh. The entire amount of the capital stock was issued to the incorporators on or about April 12, 1873. With a view of raising a working capital, Blair, Struthers and Foster had issued the following prospectus:

"NEW YORK, *January* 20, 1873.

"The capital stock of the Blair Iron and Steel Company is 25,000 shares, of $100 each, $2,500,000. This capital has been

paid up by the transfer of the patents for the Blair process and the works at Glenwood, Twenty-third Ward of Pittsburgh, Pa., to the company, (the deed for the Glenwood property to be made as soon as an empowering act can be obtained from the Pennsylvania legislature, which we have bound ourselves to procure,) and the whole stock of said company issued to us in payment therefor. We have agreed to place in the hands of General A. S. Diven, as trustee, 9000 shares of this stock, to be used as working capital for the company, subject to the order of the board of trustees of said company, except $50,000 of the proceeds thereof first to be paid to us by said trustee. The trustees of the company have, with our consent, ordered a sale of 6000 of said shares, for the purpose of raising a present working capital, and paying said $50,000, the minimum price to be $50 per share; and said trustee, with the approbation of the board of trustees, now offers said 6000 shares at said minimum price of $50 per share, to be paid for as follows, viz.: one third part thereof as soon as the whole 6000 shares shall be subscribed for, and the remainder in such instalments as the board of trustees may call for the same for the purposes of the business, the certificates to be delivered when the whole shall be paid.     "Thomas S. Blair.

"T. Struthers.

"Morrison Foster.

"By his attorney T. Struthers."

"We, the undersigned, hereby subscribe to the number of shares of the above six thousand shares set opposite to our names, respectively, to be paid for according to the terms above set forth; but this subscription not to be binding until the whole six thousand shares shall have been reliably subscribed."

A number of persons subscribed to this paper without any other condition, but Morgan, the plaintiff, demanded and obtained from the promoters of the enterprise a further stipulation or agreement, the existence of which was not made known to others who signed the original paper, some before and some after Morgan, and which additional stipulation was as follows:

"Whereas J. Pierpont Morgan has purchased four hundred shares of the stock of the Blair Iron and Steel Company, at the price of fifty dollars per share, and sold by A. S. Diven, trustee of said company: Now we, the undersigned, in consideration of one dollar to us in hand paid, the receipt whereof is hereby acknowledged, do hereby agree that if, at the end of one year from this date, said J. Pierpont Morgan shall desire to sell the said shares at the price paid for the same by him, we will purchase the same at that price, and pay to him the amount paid by him on the same, with interest at the rate of seven per cent per annum.

"THOS. S. BLAIR.
"T. STRUTHERS.

"New York, April 4, 1873."

At the end of the year the agreement of purchase was renewed for another year, and at the expiration of that year it was again renewed, the following agreement being entered into:—

"NEW YORK, *March* 22, 1875.

"In consideration of the waiver by J. Pierpont Morgan of the right of election 'to sell to us the four hundred shares of stock in the Blair Iron and Steel Company, (subscribed and paid for by him,) as he was entitled to do by agreement with us in 1873, renewed and extended, by agreement of 1874, to April 4, 1875, we do hereby agree that his right to do so shall be extended for another year, viz., to April 4, 1876. If he shall at that time elect to sell to us the four hundred shares so subscribed and held by him, we will receive and pay for the same the amount paid by him therefor, with interest at the rate of seven per cent per year from the date of the payment by him of the respective instalments thereon; and, as collateral security for the performance by us of this our agreement, we have placed in the hands of Joseph W. Drexel, Esq., four hundred shares of the stock of the said Blair Iron and Steel Company, to be held by him in trust for that purpose.

"T. STRUTHERS.
"T. S. BLAIR."

On the 20th of March, 1876, Morgan notified Blair and Struthers that he desired to avail himself of the terms of the agreement entered into between them, and on the 4th of April of that year tendered them the stock referred to in the agreement.

The defendants having failed and refused to comply with the terms of the contract of repurchase, Morgan, on the 1st of March, 1882, brought this action, averring in his declaration the foregoing facts. The defendant in his answer admitted the making of the contract declared upon, and all the facts alleged by the plaintiff in support of his claim; but set up, by way of defence, two propositions, either of which he claimed was sufficient to defeat the plaintiff's case, viz. : —

First. The contract sued on was invalid, and against public policy, because made secretly with one of a number of persons who had subscribed together, upon the same express terms and conditions, for stock in a manufacturing corporation, whereby the plaintiff had sought to procure to himself an advantage withheld from the other subscribers; and

Second. The defendant is not precluded from setting up the invalidity of such contract because he was a party to it.

The case was tried by a jury, which, under instructions from the court, found in favor of the defendant; and judgment was rendered accordingly. To reverse that judgment this writ of error is prosecuted.

*Mr. John Dalzell* for plaintiff in error.

*Mr. George Shiras, Jr.*, (with whom were *Mr. R. Brown* and *Mr. W. M. Lindsey* on the brief,) for defendant in error.

I. The contract sued on was invalid, because made secretly with one of a number of persons who had subscribed together, upon the same express terms and conditions, for stock in a manufacturing corporation, and whereby the plaintiff had sought to secure to himself an advantage withheld from the other subscribers. *Jackman* v. *Mitchell*, 13 Ves. 581; *Ex parte Sadler and Jackson*, 15 Ves. 52; *Leicester* v. *Rose*, 4 East, 372; *Coleman* v. *Waller*, 3 Younge & Jer. 212; *White*

*Mountain Railroad Co.* v. *Eastman,* 34 N. H. 124; *Miller* v. *Hanover Junction Railroad,* 87 Penn. St. 95; *Robinson* v. *Pittsburgh & Connellsville Railroad,* 32 Penn. St. 334; *S. C.* 72 Am. Dec. 792; *Melvin* v. *Lamar Iron Co.,* 80 Illinois, 446; *Blodgett* v. *Morrill,* 20 Vermont, 509; *Connecticut River Railroad* v. *Bailey,* 24 Vermont, 465; *S. C.* 58 Am. Dec. 181; *Hodge* v. *Twitchell,* 33 Minnesota, 389; *Sternburg* v. *Bowman,* 103 Mass. 325; *Fay* v. *Fay,* 121 Mass. 561; *Lee* v. *Sellers,* 812 Penn. St. 473; *Getty* v. *Devlin,* 54 N. Y. 403; *S. C.* 70 N. Y. 504. *Meyer* v. *Blair,* 109 N. Y. 600, cited and relied on by plaintiff in error, is not binding upon this court.

II. The defendant was not precluded from setting up the invalidity of the contract because he was a party to it.

Mr. Justice Lamar, after stating the case as above reported, delivered the opinion of the court.

Several exceptions were taken during the progress of the trial, to the rulings of the court in excluding evidence offered by the plaintiff, to its refusal to give instructions requested by the plaintiff, and to its general charge to the jury, which are embodied in twelve assignments of error. It is not necessary to discuss them seriatim, as the main contention relates to the correctness of the instructions given by the Circuit Court to the jury. In order to determine the principle on which the instructions rest, it will be useful to ascertain the points incidentally connected with the case about which there is no dispute.

First. It is conceded, and the court so charged the jury, correctly, as we think, that the contract made by Morgan with Struthers touching the repurchase of the stock, standing by itself, was a perfectly fair and honest one, in which there was no vice inherent that would relieve the person making it from its obligation. If, therefore, its validity or binding force is impaired, it must be because of its extrinsic effect by reason of the relations of the parties to the other stockholders in the corporation.

It is also conceded that, as to these stockholders, no actual

fraud or deceit was practised in the making of the contract sued upon. This is virtually the ground upon which the court refused to admit evidence · offered by the plaintiff for the avowed purpose of showing the good faith of the transaction as to the other subscribers. It said :

"It is not necessary for the defendants, to sustain their defence, to show actual fraud. If the tendency of such things is to operate as a fraud upon others, that is the basis of the rule."

It is also a fact, undenied and undeniable, that the plaintiff strictly complied with all the terms and stipulations expressed in the prospectus, and in the contract of subscription, by paying into the treasury of the corporation the entire amount of his subscription.

It should also be considered as conceded — for there is nothing in the pleadings, nor in the evidence, nor in any of the rulings of the court, nor in the argument of counsel, to the contrary — that he did not enter into any secret agreement with the corporation or any other person that he should not be required to pay the amount he had subscribed. And, finally, the court more than once gives strong intimation that there is no reason in equity, justice, or fair dealing, why the defendant should not be made to comply with his obligation.

On the other hand, it is conceded that the contract sued on was a collateral, optional contract, made at the time of plaintiff's subscription, which constituted the inducement to it, and was not made known to all the other subscribers to stock.

The only question, then, presented for our consideration is, whether the collateral contract, perfectly fair and honest in itself, and untainted with any actual fraud upon any person, entered into by a subscriber of stock with other subscribers, to the effect that they will purchase the same, and pay to him the amount paid by him, if at a time specified he chooses to sell the same, is contrary to public policy, and cannot be enforced against the party to it. Upon this question the view of the court below is stated very explicitly. It says :

"If others of the subscribers to the stock were not informed of the fact that plaintiff had obtained said agreement as a con-

dition or part of his agreement to subscribe for the said stock, and that the existence of such accompanying agreement was not made known to others of said common subscribers, this said agreement was in the eye of the law a fraud upon the other subscribers who did not receive and were not informed of the existence of such agreement, and was contrary to the policy of the law, and the plaintiff cannot recover."

Again, in his general charge he repeats: " Whatever may be our own views as to the honesty of such an attempt to defeat the enforcement of an honest contract, that is a consideration which you or I have nothing to do with. If you find that the beneficial arrangement set up and sought to be enforced in this suit was not made known to all the subscribers to that stock, and they were not afforded an opportunity to avail themselves of like security, that arrangement was void, and cannot be enforced."

We cannot concur in this conclusion. We are not prepared to affirm that there is a public policy which operates such a restraint upon the transfer of stock in a corporation as to render the contract in question, conceded to be valid and fair in itself, fraudulent as to the co-subscribers with the plaintiff for the 6000 shares sold by the company and to render it invalid against the party to it, who, it is admitted, has no equity or justice in his favor.

Nor do we assent to the proposition upon which this conclusion rests. That proposition is, that when a man purchases or subscribes to shares of stock in an incorporated joint stock company, there is upon him, in addition to the express terms of the subscription contract, an implied obligation, incident to the common enterprise, which restrains him from making any engagement with other individuals to secure his own stock against risk, unless the other subscribers are informed of it and put upon an equal footing as to such security.

One essential feature of an incorporated joint stock company is the right of each stockholder, without restraint, to sell or transfer his shares at pleasure. Thompson, Liability of Stockholders, § 210, and cases there cited. So well established is this right that a by-law of a bank putting restrictions upon

the transferability of stock in the hands of its members has been held void as being in restraint of trade. *Moore* v. *Bank of Commerce*, 52 Missouri, 377. Even where the charter gives the corporation the power to regulate transfer of stocks, it has been held that this power does not include the authority to restrain transfers. *Choteau Spring Co.* v. *Harris*, 20 Missouri, 382, citing 10 Mass. 476, and numerous other authorities.

Counsel for defendant urges that notwithstanding this right to make an absolute sale of his stock belongs to each subscriber, the policy of the law forbids one of them, whose act of subscription may be held out as an inducement for others to subscribe, from making a contract of future sale with a view to secure his investment; and renders such a contract void, because many co-stockholders "may have been chiefly induced to subscribe by a knowledge that so prominent and successful an operator was willing to risk his money in such an adventure; and who, had they been told that he had exacted a private security or guaranty which availed to give him the benefit of both the experiment in business and of getting back his money with interest, if it did not succeed, would assuredly either have refused to subscribe or have demanded a similar guaranty. Moreover, they had a right to suppose that the new firm was to have the countenance of Mr. Morgan and probably his assistance in the future." This is a palpable misconception of the nature of the transaction. There was nothing in the prospectus, or in the subscription contract, or in the nature of the enterprise, to justify such a presumption or expectation on the part of the other stock subscribers. It is just in this respect, especially, that an incorporated joint stock company differs from an ordinary co-partnership. In the latter, the individual members of the firm are presumed to, and in general actually do, contribute to the common enterprise, not only their several shares of partnership capital, but also their individual experience, skill or credit, no member having the right to sell out his interest or to retire from the firm without the consent of the co-partners; and if he does either, the act amounts to a dissolution of the partnership. Parsons on Partnership, § 171. The very reverse, as we have

said, is the case of a joint stock corporation, in which each stockholder, whether by purchase or original subscription, has the right, unless restrained by the charter or articles of association, to sell and transfer his shares, and, by transferring them, introduce others in their stead.

It also urged that "the other subscribers had a right to presume that Mr. Morgan went into the common enterprise upon the same terms with themselves." This proposition is true so far as those terms are prescribed in the charter, the prospectus, and the contract of subscription; but it is also true that each of those stockholders had the equal right to sell, or agree to sell, that stock whenever and to whomsoever he chose, such stock being personal property, and subject to any disposal he might choose to make of it; and that this right belonged none the less to Morgan, on account of his prominence and known skill as an operator, than it did to any other member of the corporation.

We have read with care all the authorities cited by counsel for defendant in error to support the claim that the contract in question is, in the eye of the law, fraudulent and void. Those which relate to contracts connected with subscriptions of stock are simply illustrative, in different forms, of a doctrine settled in a great number and variety of decisions, that a corporation has no legal capacity to release an original subscriber to its capital stock from payment of it, in whole or in any part; and that any arrangement with him by which the company, its creditors, or stockholders, shall lose any part of that subscription, is *ultra vires* and a fraud upon creditors and the co-subscribers. *Burke* v. *Smith*, 16 Wall. 390, 395; *Bedford Railroad Co.* v. *Bowser*, 48 Penn. St. 29; Green's Brice's Ultra Vires. This doctrine rests upon the principle that the stock subscribed, both paid and unpaid, is the capital of the company, and its means of carrying out the object for which it was chartered and organized. All these cases fall within this principle. In each of them the agreement declared void, had it been carried out, would have diminished the common fund, which is a trust fund for the benefit of the general creditors of the corporation, the stockholders, and all others having an

interest therein, and would have been violative of the terms upon which the subscriptions had been expressly made, and under which the trust originated. The corporation would have been damaged in its capital by the loss of the subscriptions, and the co-subscribers would have been damaged by the lessening of their common trust fund. As we have seen, no feature of damage to the corporation, actual fraud, or violation of contract, exists in this case. The contract sued on, if specifically carried out, would have simply resulted in what all agree lay within the power of each subscriber at the time of making his subscription — a transfer of his stock and the introduction of other stockholders in his stead.

Counsel for defendant has cited cases of composition between an insolvent debtor and his creditors, where one creditor has secured, by a secret arrangement, either with the insolvent or some other person, terms more favorable to himself than the composition agreement provided for all of the other creditors joining therein. In the English cases the doctrine is carried to the fullest extent, that such secret arrangements are utterly void, even as against the party with whom the arrangement was made. The American decisions, whilst perhaps not going to the extent of the English decisions, clearly assert the illegality of such arrangement. 1 Story Eq. Jur. §§ 378, 379; *White* v. *Kuntz*, 107 N. Y. 518. But we think that the analogy between the cases of composition agreements and those of stock subscriptions is remote, and that the decisions as to the former are not applicable to this case.

The relations of composition creditors, either to the insolvent's estate or to each other, are widely different from those which stock subscribers bear to the corporation and their co-subscribers. Upon the failure or insolvency of a debtor, his creditors stand together in a common relation of claims, proportionate to their amount and grade, upon an interest in his (the insolvent's) estate. "The purport," says Mr. Justice Story, "of a composition or trust deed, in cases of insolvency, usually is, that the property of the debtor shall be assigned to trustees, and shall be collected and distributed by them among the creditors, according to the order and

terms prescribed in the deed itself. And, in consideration of the assignment, the creditors, who become parties, generally agree to release all their debts beyond what the funds will satisfy." 1 Story Eq. Jur. § 378. It is clear that any secret bargain by which one of these creditors obtains more than the composition deed gives, and more than he agrees under it to take, violates the equality which is the basis of the deed of settlement, and operates a gross fraud upon the creditors — a fraud which the law, in its policy of precaution rather than by mere remedial justice, suppresses by depriving the parties of the fruit of their clandestine arrangements.

It is not necessary to restate the widely different basis of the relation of stock subscribers to a joint stock corporation and to each other, where each subscriber acts for himself, in the act of subscription, with the unrestricted right, in the exercise of vigilance and foresight, to make any arrangement for the security of his shares, provided he does not lessen the amount of his subscription, which constitutes part of the trust fund in which all the subscribers have an equal interest.

We think this case perfectly clear on principle. We cite, however, as persuasive authority in support of our conclusion, the decision in *Meyer* v. *Blair*, 109 N. Y. 600, 607, in which a contract identical in every material particular with the one we are considering, made between Blair and Struthers and Meyer, a subscriber to the 6000 shares of stock, was considered by the Court of Appeals of the State of New York, and held valid and binding upon the parties to it. In that case the court says :

"The present case is not, we think, within the principle of the stock-subscription cases, or the cases of composition, to which reference has been made. The main object of the company in offering the stock for sale was to secure 'working capital,' as is shown by the prospectus. This object was known to the subscribers. If the subscription of the plaintiff was a pretence merely, or if the subscription had been accompanied by a secret agreement between the plaintiff and the company that he should be relieved from the subscription, or by which the terms of the purchase were materially changed to the disadvantage

of the company, and for the advantage of the plaintiff, there might be ground for applying the rule declared in the subscription cases, and declaring the transaction to be a fraud on the other subscribers. . . . But there was no agreement between the company and the plaintiff, secret or otherwise, direct or indirect, except the agreement contained on the face of his subscription. The plaintiff, by his subscription, became bound to the company to take the shares subscribed for, and this agreement has never been discharged, or in any way impaired. The plaintiff remained bound by his subscription, notwithstanding the agreement with the defendants, as fully and completely as though the agreement with the defendants had never been made. Nothing has occurred to change, qualify or limit his obligation to the company. The company sold the shares to secure ' working capital.' . . . The defendants were interested in setting the company afoot. They were the principal holders of its stock. . . . They sought out the plaintiff. On his declining at first to subscribe to the stock of the company, they offered him the inducement that they would take the stock off his hands within a year, at cost price, if he desired it. It appears that the same inducement was offered to other subscribers, but not to all. We think there was nothing illegal in the arrangement."

The conclusions to which we have come on the questions discussed dispense with any consideration of the other point presented by the plaintiff in error, viz.: that the defendant should be estopped from setting up the invalidity of the contract sued on because he is a party to it. For, as we have found the contract valid and legal, the question of estoppel does not arise.

For the foregoing reasons,

*The judgment of the court below is reversed and the cause remanded, with instructions to grant a new trial and to take such further proceedings as shall be consistent with this opinion.*