# Wytheville

## M. M. MARCUSE AND M. E. MARCUSE V. BROAD-GRACE ARCADE CORPORATION.

June 13, 1935.

Present, Campbell, C. J., and Holt, Gregory, Browning and Chinn, JJ.

The opinion states the case.

*Kirsh & Bazile* and *Williams, Mullen & Hazelgrove,* for the plaintiffs in error.

*Brockenbrough Lamb, Christian, Barton & Parker,* and *Lewis F. Powell, Jr.,* for the defendant in error.

CHINN, J., delivered the opinion of the court.

This is a writ of error to a judgment of the Law and Equity Court, Part 2, of the city of Richmond, in an action by notice of motion brought by Broad-Grace Arcade Corporation against M. M. Marcuse and M. E. Marcuse to

recover the sum of $25,000, alleged to be the balance due by defendants below on a subscription contract for 500 shares of the stock of said corporation.

The undisputed facts pertinent to the issues involved may be stated as follows:

M. M. Mitteldorfer was the owner of certain real estate situated on Third street in the city of Richmond and extending from Broad to Grace streets. For several years prior to the events hereinafter related, Morton G. Thalhimer, president of Morton G. Thalhimer, Incorporated, a prominent real estate concern in the city of Richmond, had been interested in the Mitteldorfer property on account of his personal friendship for the owner and its possibilities for business development. He finally conceived the idea of organizing a corporation to buy the property and erect thereon an arcade building, containing stores, offices and other rentable space. He accordingly undertook to obtain subscribers to stock in the proposed corporation under a subscription agreement, proposing to provide the necessary capital by the issuance of 3,500 shares of preferred stock at a par value of $100 per share, and 3,250 shares of common stock of the same par value, and a mortgage loan on the property for the balance needed. The subscription agreement, which bore date as of February 11, 1928, after setting forth the purpose of the proposed corporation and the financial plan above outlined, provided that the agreement should not be binding upon any of the subscribers unless $350,000 of preferred stock and $325,000 of common stock should be subscribed for under said agreement or a duplicate thereof.

During the period of several months in which Thalhimer was endeavoring to secure subscriptions to the stock of the proposed corporation, he frequently discussed the matter with M. E. Marcuse, one of the defendants, and A. J. Marcuse, brothers of M. M. Marcuse. The Marcuse brothers, consisting of M. M. Marcuse and A. J. Marcuse, who lived in New York, and Milton E. Marcuse and I. J. Marcuse, who lived in Richmond, were near relatives of the

Mitteldorfers and were supposed to be interested in Thalhimer's efforts to save the Mitteldorfer property from foreclosure. Following up these personal conferences, on April 4, 1928, Thalhimer wrote Milton E. Marcuse a long letter, setting forth in detail the entire plan in reference to the organization of the proposed corporation and the purchase and development of the Mitteldorfer property, and what he had up to that time accomplished to that end. So much of this letter as is pertinent reads as follows:

"Dear Mr. Marcuse:

"As you doubtless know, for the last two years this office has been working very hard in an attempt to dispose of the Mitteldorfer property and thereby get them out of their financial difficulties.

\*       \*       \*       \*       \*       \*       \*       \*

"After the payment of all past due interest, principal mortgages, past due taxes and other debts of the Mitteldorfers, they will receive $182,000 worth of common stock. The writer will underwrite the balance of the common stock, paying $100 per share net to the company for the same, thereby taking the common stock at $100 per share. I have already disposed of $190,000 worth of the $350,000 preferred stock to investors, leaving a balance necessary in order to consummate this transaction of $160,000.

"It is now suggested that an underwriting syndicate take over this $160,000 of first preferred stock at par and thereby close the deal.

\*       \*       \*       \*       \*       \*       \*       \*

"If you and your brothers will subscribe to $40,000 of this stock outright, or join me in the underwriting of this preferred stock, your responsibility would be limited to one-fourth of the same, and I will devote twenty-five per cent of my time in the next sixty days to selling this stock, and in my opinion could dispose of the same in that time, thereby relieving you in the final analysis in laying out any appreciable amount of money.

"You, of course, understand that I am not guaranteeing to sell this stock, but I am simply telling you that I think

it can be sold, and of my willingness to continue my efforts toward that end."

It appears that M. E. Marcuse communicated the contents of this letter to M. M. Marcuse by telephone, and, after this conversation with his brother, M. M. Marcuse, on the same day, April 4, 1928, wrote to Thalhimer as follows:

"This is to confirm my message to you today through Mr. M. E. Marcuse in regard to underwriting a part of the issue of preferred stock to be issued by or on behalf of the Mitteldorfer interest in connection with the development of their Broad street and adjacent properties.

"I understand there is still $160,000 of a total of $350,000 preferred stock unsold, that you with two others are willing to underwrite the sale of $110,000 of this amount provided I individually or with my brothers underwrite this stock to the extent of $50,000. I hereby agree to do so and consider myself obligated to take five-sixteenths of any part of this $160,000 which may not be disposed of to other purchasers. I presume that if and when a formal document covering this agreement is sent to me that it will provide for reasonable notice.

"Allow me to express my appreciation of the interest you have taken in this problem. I earnestly hope the financial result will be in accordance with your expectations and that it may result in peace of mind to those most directly interested."

On April 5, 1928, Thalhimer acknowledged receipt of this letter expressing the appreciation of Mr. Mitteldorfer and himself for Mr. Marcuse's interest in the matter; stating in case Marcuse should be called upon to purchase the stock he would receive at least fifteen days' notice in advance of the time the money is needed; that Marcuse's joining in the underwriting of the stock enabled him to make a sale for the Mitteldorfers, and concluding his letter as follows: "If any further formal document is needed regarding this matter, it will be submitted to you at a later date. So far as I, personally, am concerned, however, your letter of April 4th and this letter to you fully covers the situation."

Having secured subscriptions to the full amount of the stock proposed to be issued, a charter was obtained in the name of Broad-Grace Arcade Corporation, and the minimum amount of stock prescribed by the charter having been paid for, on May 14, 1928, the initial meeting of the incorporators was held, at which meeting a resolution was adopted by the stockholders authorizing the board of directors to accept subscriptions for the authorized issues of preferred stock and common stock, respectively, at a price of not less than $100 per share. The board of directors met on May 22, 1928, when there was presented to it by Mr. Thalhimer a copy of the original subscription agreement signed by the subscribers for the full amount of the preferred and common stock to be issued. Among these subscribers appeared the name of M. M. Marcuse for 500 shares of preferred stock, which had been signed by Morton G. Thalhimer with the notation thereon, "by letter." The board thereupon passed a resolution accepting all said offers of subscriptions to the preferred and common stock, and authorizing and directing M. G. Thalhimer, as president, to make calls for payments on account of such subscriptions at such times as he might consider to be in the interest of the corporation.

Thalhimer, having been unable since April 4th to secure any other subscriptions to the preferred stock, on May 26th wrote a formal letter to M. M. Marcuse, a copy of which was sent to Milton E. Marcuse, advising him that the corporation had received its charter and held its organization meeting, and sending him a list of the officers, directors and executive committee; also advising him on behalf of the corporation that his "subscription" had been accepted, but that "your subscription for 500 shares has not been called for payment as yet." Under date of May 31, 1928, Marcuse acknowledged receipt of this letter, merely saying: "I hope all of yours and Meno's expectations will be realized. I know you will give me notice when cash is needed."

On August 27, 1928, a "special meeting of the stockholders and of the subscribers to the capital stock" was called and held for the purpose of considering a proposal

to sell a part of the land owned by the corporation. This meeting was not limited to subscribers who had paid for and received their certificates of stock, but was a meeting of both the stockholders and the subscribers whose subscriptions to the capital stock had been accepted. The first annual meeting of the corporation was held on January 22, 1929. This meeting was also participated in by subscribers as well as the paid-up stockholders, and one of the resolutions adopted "approved and accepted as the acts of this corporation * * * the acts of the board of directors and executive committee as recorded in the minutes of their meetings which have been laid before this meeting." Another special meeting of the stockholders and subscribers was held on March 30, 1929, for the purpose of ratifying and approving the mortgage to be placed on the corporate property in favor of the New York Life Insurance Company in the amount of $500,000.

In the meantime, after repeated efforts on the part of Mr. Thalhimer to collect from M. M. Marcuse a part of his subscription, he had paid $12,500 for 125 shares on March 4, 1929, and on June 10, 1929, he paid an additional $12,500 for a like number of shares. All of the common stock subscriptions had been called and paid in full during the year 1928, and by December 29, 1930, all of the preferred stock subscriptions had been called and paid with the following exceptions: 324 shares of 695 shares subscribed to by Morton G. Thalhimer, who had paid for 371 shares; 250 shares of the 500 shares subscribed to by M. M. Marcuse, who had paid for 250 shares as above noted; fifty shares subscribed to by Christian and Barton, attorneys—Mr. Andrew D. Christian of said firm having already paid for 250 shares subscribed to by himself and members of his family; and forty-five shares of 100 shares subscribed to by Morris Block, who had paid for fifty-five shares; thus making a total of 669 shares of preferred stock subscriptions then outstanding and unpaid. In the meantime the arcade building had been completed and was then partly occupied by tenants.

It appears that Mr. Andrew D. Christian had become dissatisfied because of the subscriptions above mentioned which had not been paid up, taking the position that said unpaid subscriptions should be immediately called, or the subscribers thereof released. In consequence of this attitude on the part of Mr. Christian, the matter was brought before the meeting of the board of directors held on December 29, 1930, whereupon, on motion that the unpaid subscriptions be cancelled, a resolution authorizing the president to effect such cancellation was prepared by Mr. Christian and unanimously adopted. Pursuant to that resolution, under date of January 3, 1931, Thalhimer addressed a letter to the subscribers who had not paid their subscriptions in full, advising them of the action of the board of directors, and inclosing a letter for them to sign and return if it was their desire to accept the cancellation set out in the resolution. In reply, M. M. Marcuse promptly returned a letter addressed to the Broad-Grace Arcade Corporation, saying:

"It is entirely agreeable to me that my subscription for two hundred and fifty (250) shares of the preferred stock of the Broad-Grace Arcade Corporation be cancelled as authorized by resolution of the board of directors adopted December 29, 1930, and this is to be taken as a cancellation of the same."

Shortly after January 3, 1931, and before a reply had been received from M. M. Marcuse, several holders of the preferred stock, having learned of the action of the board of directors, communicated with Mr. Thalhimer, protesting against the cancellation of unpaid subscriptions. After conferring with Christian and other members of the board, Thalhimer wrote Marcuse and the other subscribers advising each of them that objection had been made to the cancellations and asking them to destroy the letter of January 3rd and consider themselves as still being bound upon their subscriptions until the matter was again considered by the board. A meeting of the board was held on January 22, 1931, minutes of which, after recording in detail what had transpired since December 29, 1930, show that a resolution

was unanimously adopted rescinding the resolution of December 29, 1930.

The regular annual meeting of the stockholders was held on January 27, 1931. At this meeting a resolution was adopted approving and accepting as the acts of the corporation the acts of the board of directors and of the executive committee, as recorded in the minutes of meetings laid before the stockholders' meeting. Subsequently a formal call was made on M. M. Marcuse, and all of the subscribers who had not paid in full for their subscriptions. Thalhimer and Christian and Barton paid in cash the balance due on their subscriptions, but Marcuse and Block denied liability and refused. Thereupon this suit was brought, and the record shows that at the time of the trial of this case a separate suit was pending against Block to recover the amount the corporation claimed to be due by him on account of his subscription contract.

The petition contains four assignments of error. Assignments numbered one and two relate to the action of the court in giving two certain instructions for the plaintiff, and in refusing certain instructions offered by the defendants. It is obvious, however, if not conceded, that if the trial court was right in giving plaintiff's instructions it was also right in refusing those offered by the defendants. The aforesaid assignments will, therefore, be disposed of together in the determination of the questions raised as to plaintiff's instructions.

It is contended that the court erred in instructing the jury "that under the undisputed evidence M. M. Marcuse became bound as a subscriber to the $50,000 of the preferred stock of the plaintiff by ratification of the signing of his name to the subscription agreement, dated as of February 11, 1928, and accepted by the plaintiff corporation on May 22, 1928." This instruction is first objected to on the ground that it was testified by M. M. Marcuse that he did not know that his name had been signed by Thalhimer to the subscription agreement in question and he, therefore, could not have ratified and become bound by it. While it is true that

Marcuse did state in the course of his testimony that he knew nothing of the stock subscription agreement and did not know that Thalhimer had signed his name to the same, it clearly appears from his own testimony as well as from the undisputed facts as shown by other oral and documentary evidence, that at the time Marcuse wrote the letter to Thalhimer, dated April 4, 1928, he was interested in Thalhimer's efforts in behalf of his kinsman, was fully advised as to Thalhimer's plans, and knew it was necessary, in order to organize the corporation and effect its purposes, that the proposed issues of preferred and common stock should be fully subscribed for. By that letter he expressly agreed to underwrite preferred stock to the extent of $50,000, or, in any event, to take five-sixteenths of any part of the $160,000 of preferred stock then unsold which might not be disposed of to other purchasers. He knew from Thalhimer's letter of April 5, 1928, that his subscription to the stock of the corporation completed the sale of the stock insofar as was necessary to make sale of the Mitteldorfer property and carry out the purposes of the corporation. While it may be true that this correspondence does not expressly authorize Thalhimer to sign his name to the stock subscription agreement, it is apparent that it was Marcuse's intention to authorize Thalhimer to do whatever was necessary to commit him to the purchase of 500 shares of the preferred stock, and that Thalhimer had, therefore, at least implied authority from Marcuse to sign in his name the subscription agreement which had been signed by other subscribers, with the understanding between Thalhimer and himself that Thalhimer would endeavor to dispose of the stock to other persons. If this be the correct view as to Marcuse's intention, it is immaterial whether he ratified Thalhimer's act or not, and in that case the instruction complained of could only constitute harmless error. But whatever may have been Marcuse's intention with reference to Thalhimer's authority to sign the subscription agreement for him, we think the trial court was clearly right in instructing the jury that the undisputed evidence showed that he had ratified

Thalhimer's act in committing him to take the stock in question. This is shown by numerous admissions in Marcuse's own testimony, by the documentary evidence, and by his own acts and conduct in reference to the matter. Numerous references are made in his testimony and in his letters to his "subscription." For example, in testifying about the letter of May 26th, written to him by the corporation advising him that his subscription for 500 shares had been accepted, he stated on cross-examination that he interpreted that letter as meaning that his subscription to the stock had been accepted, and that Thalhimer's efforts to sell the same to others would be continued. Receipt of this letter was acknowledged by Marcuse by a letter in which he merely said: "I know you will give me notice when cash is needed." The evidence shows that at every meeting of the stockholders and subscribers from the time of the organization of the corporation until the annual meeting held on January 22, 1931, Marcuse was represented by his duly and regularly authorized proxy who voted 500 shares of stock for him at each of said meetings. The correspondence relative to paying the $25,000 which he finally paid on this subscription and the acceptance of the stock certificate issued therefor is also irrefutable evidence that he recognized his obligation to take the stock in question and, therefore, ratification of what Thalhimer had done to commit him to take it.

All acts and correspondence relative to this matter clearly show that M. M. Marcuse, as well as his brother, M. E. Marcuse, and the board of directors of the corporation, all understood that he was liable for the subscription to this stock according to the commitment made for him by Mr. Thalhimer under the authority of his letter of April 4, 1928. As stated in the brief of counsel for the plaintiff, it was not suggested by a single witness for either of the parties that M. M. Marcuse had at any time prior to the trial of the case even so much as intimated that he was not a subscriber to the stock of the corporation, or that he was not bound to the corporation to the full extent of 500 shares until he

was notified that the board of directors at its meeting on December 29, 1930, had undertaken to cancel his unpaid subscription then existing. To summarize, the admissions of Mr. Marcuse himself when on the witness stand in the trial of the case and in the correspondence between the parties, his acts and conduct in participating by proxy in the meetings of the corporation, in paying for and accepting a stock certificate for one-half of the amount subscribed for, and his acquiescence in being placed in the position of a subscriber, all constitute such clear and undisputable proof of his ratification of Mr. Thalhimer's act in putting him down as a subscriber, that his mere statement that he did not know Thalhimer had signed his name does not, under the circumstances, furnish a jury question. Having acknowledged the validity of the contract of subscription, the manner in which same was executed is immaterial. *A. I. M. Percolating Corp.* v. *Ferrodine Chem. Corp.*, 139 Va. 366, 124 S. E. 442.

In the case of *Watters & Martin, Inc.* v. *Homes Corp.*, 136 Va. 114, 116 S. E. 366, 369, where an action was brought against plaintiff in error on a subscription to the capital stock of the Homes Corporation made before its organization, and the defense was that there had been a material variance between the prospectus and the charter, this court, in holding the defendant company liable, said:

"In *Greenbrier Industrial Exposition* v. *Squires*, 40 W. Va. 307, 21 S. E. 1015, 52 Am. St. Rep. 884, the law is stated as follows: 'The cases in regard to this point have all been examined and they all agree that where the subscription has been acquiesced in, either by payment of part of the subscription, or by becoming a director, or by attending meetings of the stockholders, or by any other act indicating an acquiescence in the validity of his subscription, his defense based on mere technical objection will be disregarded.' Further, at page 311 of 40 W. Va., at page 1016 of 21 S. E., 52 Am. St. Rep. 884 [887], the court said: 'Even where articles of association are altered, or an attempt is made to transfer a subscription to a new company,

the subscriber will be liable if he consented to the change either by word or act indicating acquiescence.' Citing *Hammond* v. *Straus,* 53 Md. 1, 16; 1 Morawetz on Private Corporations, section 63."

We consider the above cases and authorities therein referred to as sufficient to sustain the view that no error was committed by the trial court in giving the instruction referred to for the reasons assigned, but the following authorities cited in the brief also seem, to some extent at least, applicable. *West End Real Estate Co.* v. *Claiborne,* 97 Va. 734, 742, 34 S. E. 900; *Southern Amusement Co.* v. *Ferrell-Bledsoe Furniture Co.,* 125 Va. 429, 99 S. E. 716.

It is next contended that the above instruction is erroneous because the notice of motion purports to base the action upon a written stock subscription agreement, whereas, at the trial of the case the plaintiff relied on the fact that Marcuse ratified the original stock subscription agreement under date of February 11, 1928, "without making any reference in their pleadings to the fact that they intended to rely on the doctrine of ratification." In other words, as we understand this objection, defendants contend that the instruction should not have been given because there is a variance between the allegations and the proof.

While the record shows that at the conclusion of the evidence the defendant, M. M. Marcuse, moved to strike the plaintiff's evidence "because of variance between the *allegata* and *probata,*" the court does not seem to have passed on this motion. At any rate, we find in the record no exception taken to any action or non-action of the court in regard to the motion. Neither does the instruction referred to appear to have been objected to on this ground, and under the well known rule, it cannot be made for the first time in this court.

It may moreover be said that the fact the declaration fails to allege the ratification of the agreement does not appear to us to constitute such a variance as prejudiced the defendants, since the obligation of the defendants arising from the ratification of the contract sued on is exactly the

same it would have been if the defendants had actually signed the contract themselves.

In 2 Corpus Juris, at page 516, the rule on the subject is thus stated: "In accordance with the maxim * * * every ratification relates back and is equivalent to prior authority —it is a well settled rule, subject to certain exceptions [where, for example, the rights of innocent third parties are affected], that a ratification relates back to the time when the unauthorized act was done and makes it as effective from that time as though it had been originally authorized, and that therefore upon ratification the parties to all intents and purposes stand in the same position, in respect to rights and liabilities arising out of such act, as though the person assuming to act as agent had acted under authority previously conferred, * * *."

The other instruction given for the plaintiff objected to by the defendant reads as follows: "The court instructs the jury to disregard all the evidence introduced concerning the resolution which the board of directors of the plaintiff corporation undertook to pass on December 29, 1930, authorizing the release of the unpaid stock subscriptions; and to disregard also the acts of the president pursuant to that resolution. The court tells the jury as a matter of law that this attempted release and defendant's acceptance thereof did not operate to release or affect in any way the obligations of the defendants or either of them, if any, to take up and pay for the stock of the plaintiff corporation."

This instruction is objected to on the ground that the resolution of the board of directors at the meeting of December 29, 1930, and the letter of January 3, 1931, to M. M. Marcuse, and his reply thereto, operated to release and cancel such subscription. On the other hand, the plaintiff corporation contends that there is no release or cancellation of the unpaid Marcuse subscription for two reasons: (1) There was no legally constituted quorum present at the directors meeting of December 29, 1930, and, therefore, the resolution adopted and the acts of Thalhimer thereunder were of no effect whatsoever; and (2) regardless of the

question of whether there was a legally constituted quorum on the occasion referred to, the board of directors had no authority to cancel stock subscriptions without the unanimous consent of all the subscribers and stockholders of the corporation. These respective contentions present the vital questions in the case.

The evidence shows that at the time the resolution was passed the board of directors of the corporation consisted of twelve members. Not less than seven, therefore, were necessary to constitute a quorum for the transaction of business. At the meeting of the board on December 29, 1930, there were nine directors present, all of whom voted in favor of the cancellation resolution. It is contended by the plaintiff that four of the directors present and voting, namely: A. D. Christian, M. G. Thalhimer, M. E. Marcuse and W. C. Evans, were disqualified to vote on the resolution releasing subscribers who were in default in payment for their stock.

In 3 Fletcher's Encyclopedia Corporations, chapter 11, section 924, the rule on this subject is thus stated: "If an officer of a corporation, either alone or with other officers, represents the corporation in making or authorizing a contract or other transaction, in which he is personally interested, either directly or indirectly, and his action of consent is necessary, the contract or transaction, even though it may not be void or voidable for want of two parties, comes within the well settled rule that a trustee cannot become interested to the detriment of his *cestui que trust*, or an agent to the detriment of his principal. * * * In such a case, the transaction is, at the least, voidable at the option of the corporation, and may be avoided and set aside, or affirmed and any profits recovered, without proof of actual fraud, or of actual injury to the corporation."

And again in section 936, the author continues: "It has already been stated that the vote of an interested director cannot be counted to make up a majority vote necessary to pass a resolution of the board of directors.

"In such a case where a director *is the other party*

*to a transaction with his corporation, or is the agent of the other party, or is personally interested in the other party,* and he votes in favor of the transaction as a director of his corporation, and his vote is necessary to make up a majority necessary to pass the resolution, there is no question but that the transaction is included in the class where the officer deals with himself and represents both sides of the transaction, and hence is voidable at the option of the corporation, merely because of the relationship of the parties, without any other ground and regardless of the fairness or good faith of the transaction." (Italics supplied.)

And in section 938, after stating that a director cannot form a part of a quorum to act upon a proposition in which his individual interest is adverse to the corporation, and that in such case the interested director is disqualified from acting because he cannot deal with himself and without him there is no quorum of the directors, such as is necessary to transact business, it is said: "It follows, that if the presence of an interested director is necessary to the existence of a quorum, action taken is voidable at the instance of the corporation, and it would seem that no question as to fairness or good faith can be raised."

In Thompson on Corporations, vol. 2 (3d Ed.) section 1337, the rule is stated as follows: "Very plainly a director is disqualified from voting on matters in which he has a personal interest, or on matters concerning the personal interest of a director who controls his vote. The rule is that any resolution passed at a meeting of the directors at which a director having a personal interest in the matter voted, will be voidable at the instance of the corporation or the stockholders without regard to its fairness, where the vote of such directors was necessary to the passage of such resolution. A resolution adopted on a vote of interested directors is voidable at the option of the corporation, and this rule is equally applicable where the interest of other persons not directors are affected by the resolution."

In section 1257 of the same work, it is said: "The cases are practically unanimous on the proposition that a direc-

tor who is personally interested in a given proposition, or as to any matter pending before the board, is disqualified from acting and cannot be counted in estimating the quorum * * *."

"A director who is disqualified by personal interest from voting on a particular matter before the meeting, cannot be counted for the purpose of making a quorum or a majority of the quorum. The act done is invalid where his presence is necessary to constitute a quorum, or where his vote is necessary to the passage of the resolution regardless of the fairness or good faith of the transaction; * * *." 14A Corpus Juris 92, and cases cited.

The only Virginia case pointed out to us in which the precise question now under discussion is involved, is *Triplett* v. *Fauver,* 103 Va. 123, 48 S. E. 875, which was decided at the time the statute (Code 1887, section 1122) was in force providing that, no member of a board should vote on a question in which he is personally interested otherwise than as a stockholder. This statute having been repealed, the case is not applicable, but there are numerous Virginia cases which apply the doctrine above quoted to ordinary agents, and which would seem to be, by analogy, applicable to the case at bar for the reason that directors themselves are agents of and for the corporation. *Williams* v. *Fidelity Loan & Savings Co.,* 142 Va. 43, 128 S. E. 615, 45 A. L. R. 664; *Winston* v. *Gordon,* 115 Va. 899, 80 S. E. 756. The principal cases applying the above doctrine to ordinary agents cited in the brief, and which may here be referred to as illustrative of the doctrine, are *Williams* v. *Bolling,* 138 Va. 244, 121 S. E. 270; *Ferguson* v. *Gooch,* 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234; *Cardozo* v. *Middle Atlantic Immigration Co.,* 116 Va. 342, 82 S. E. 80. We have been referred to numerous decisions, both State and Federal, in support of the doctrine stated in the text of the above cited works on corporations, some of which appear in the footnotes and are unnecessary to be noted here. We will, however, call attention to the case of *In re Webster*

*Loose Leaf Filing Co.* (D. C.) 240 Fed. 779, and the cases there cited as instructive.

Applying the foregoing principles to the facts, we think the contention of the plaintiff, that there was no legally constituted quorum of directors present at the meeting of December 29, 1930, and as so held by the trial court, is sound. It appears that Mr. Christian, Mr. Thalhimer and M. M. Marcuse were at the time of the adoption of the resolution personally liable to the aggregate amount of $62,400 on account of unpaid stock subscriptions. Mr. Christian testified that he "was not thinking of the corporation at the time one way or the other." Mr. Thalhimer said that he was anxious to be relieved of his stock subscription if he could properly be released from it.

Under date of January 24, 1931, M. M. Marcuse wrote the corporation that his brother, Milton E. Marcuse, represented him as stockholder, and had accepted in his behalf the action of the board of directors taken on December 29th. M. E. Marcuse was, therefore, representative and agent of M. M. Marcuse in voting for the resolution of release and testified that he knew, as did everybody else, that M. M. Marcuse wanted to be released of his subscription. Clearly, therefore, under the rules above quoted, these three gentlemen were disqualified to act in voting for the resolution in which they were thus interested, which left less than a quorum of the directors to act. We also agree with plaintiff that W. C. Evans was disqualified to vote on the resolution. He testified that he was employed by Morton G. Thalhimer, Incorporated; that he owned no stock, and that his only interest in the corporation was as agent "for Mr. Thalhimer and Morton G. Thalhimer, Incorporated." Knowing Mr. Thalhimer wished to be released, it seems obvious that this director was disqualified in casting his vote in Mr. Thalhimer's interest.

Regardless, however, of the question of quorum, we do not think the board of directors had any power to cancel or release the stock subscriptions under the circumstances. While it is true that directors may compromise with sub-

scribers where there is a sufficient consideration and there is no fraud or wrong against creditors or other stockholders, the directors ordinarily have no authority to release stockholders from liability on their subscriptions. 2 Fletcher's Encyclopedia Corporations, section 529.

In Vol. 4, section 1743, the same author says: "The stockholders, as such, at a stockholder's meeting, or by acquiescence in a revocation by corporate officers, may release a subscription, provided the corporation has power so to do, and provided the consent is unanimous, except where the power to make such agreements is vested by a general statute or charter provisions in a board of directors."

"The general rule is that a board of directors cannot release a stock subscription, either wholly or in part. Especially is this so whether the released subscriber is one of the corporate directors." *Id.*, vol. 4, section 1744. In the same section the author refers to certain exceptions to the above rule, none of which are applicable to the case at bar and, therefore, need not be further adverted to.

In 2 Thompson on Corporations (3d Ed.), section 850, it is said: "It may be asserted as the first rule under this proposition that, after a valid subscription to the capital stock of a corporation has been made and accepted, there can be no cancellation or release from the obligation without the consent of the corporation and all the stockholders; in other words, the subscriber cannot withdraw from the corporation at his pleasure."

And in section 852, the same authority says: *"Directors cannot release subscriber.* It seems now to be well established by the authorities that the directors or trustees of a corporation have no power to cancel a subscription and release the subscriber. They are charged with the duty of maintaining and preserving the capital rather than dissipating it. The very obligation and duties assumed by them are inconsistent with any power to arbitrarily release or cancel any part of the capital stock." See also, *Id.*, vol. 5, section 3941; 26 Am. & Eng. Enc. of Law (2d Ed.) page 939.

■■■ "The general rule is that a subscription for stock of a corporation cannot be cancelled so as to release the subscriber from liability thereon without the consent of all the stockholders or subscribers, if the subscription is valid and binding, unless there is some special and adequate reason and consideration for the cancellation and release." 14 Cor. Jur., page 621.

"A subscriber for stock in a corporation cannot obtain a cancellation of his subscription except by the unanimous consent of the other subscribers. Even a majority of the stockholders cannot withdraw and refuse to proceed. By unanimous consent, however, of the stockholders a subscription may be cancelled, and a subsequent creditor of the corporation cannot complain." 1 Cook on Corporations, section 169.

The foregoing authorities are fully sustained by innumerable decided cases cited in the footnotes. Only a few of them which seem particularly applicable may be noted. *Morgan* v. *Struthers,* 131 U. S. 246, 9 S. Ct. 726, 33 L. Ed. 132; *Enright* v. *Heckscher* (C. C. A.) 240 Fed. 863; *Thomas* v. *Wentworth Hotel Co.,* 16 Cal. App. 403, 117 Pac. 1041, 1046; *Melvin* v. *Lamar Insurance Co.,* 80 Ill. 446, 22 Am. Rep. 199; *Cartwright* v. *Dickinson,* 88 Tenn. 476, 12 S. W. 1030, 7 L. R. A. 706, 17 Am. St. Rep. 910; *Bedford R. Co.* v. *Bowser,* 48 Pa. 29.

Defendants rely upon *Stuart* v. *Valley R. Co.,* 32 Gratt. (73 Va.) 146, and *Elliott* v. *Ashby,* 104 Va. 716, 52 S. E. 383, as "authority for the proposition that a corporation without approval of the stockholders and creditors, may estop itself by action of the directors or the stockholders from insisting on the performance of a stock subscription, otherwise binding."

In the first named case Stuart was sued upon a subscription agreement. His defense was that he had never become a legal subscriber to the capital stock because he revoked his subscription previous to the legal organization of the corporation, and the corporation upon its organization refused to receive the same as a subscription or to

treat the defendant as a subscriber to the stock. It, therefore, appeared that the offer to subscribe was withdrawn before it was accepted by the corporation, and did not for that reason constitute a binding contract.

In *Elliott* v. *Ashby* practically the same state of facts existed, it appearing that after the signing of his name to the subscription agreement Elliott directed the person who procured his signature to remove his name from the list before the same was accepted by the company. The court held that as the evidence showed that the subscription was not in fact regarded by the company as binding upon it, and that the subscriber was not regarded by himself or by the company as a stockholder thereof, the defendant was not liable. It is obvious that neither of those cases support the contention of the defendants. On the other hand, the opinions in both cases impliedly hold that a contract of subscription can be released only by the stockholders of the company, or by the board of directors duly authorized to do so by the stockholders.

It is further argued that the release of the stock subscriptions is analogous to the purchase by the corporation of its own stock, and the cases of *Kennerly* v. *Columbia Chemical Corp.*, 137 Va. 240, 119 S. E. 265, and *Grace Securities Corp.* v. *Roberts*, 158 Va. 792, 164 S. E. 700, are relied on in support of the proposition. While these cases hold that, in the absence of inhibition by its charter or by statute, a corporation has the power to purchase its own stock, when done in good faith, it is equally well settled in this State that "a corporation has no right to purchase its own shares if the substantial rights of either stockholders or creditors will be adversely affected thereby." *Kemp* v. *Levinger*, 162 Va. 685, 174 S. E. 820, 827; *Marshall* v. *Fredericksburg Lumber Co.*, 162 Va. 136, 173 S. E. 553. The evidence in the instant case shows that at the time the resolution of release was passed there was no market for the stock of the corporation, which was going begging at $80 per share, and the corporate surplus was less than $900. Under these circumstances we think it would have been

manifestly discriminatory and adverse to the interests of those stockholders who had paid full par value for their stock, contrary to the terms of the subscription agreement and over their protest to release the delinquent subscribers and thereby discard a substantial part of the capital assets, without any consideration whatever therefor, to say nothing of the rights of the New York Life Insurance Company which is a large creditor of the corporation. Moreover, it should be noted that in the *Kennerly* and *Grace Securities Co. Cases* the corporation contracted to purchase the stock before it was acquired by the holder, which is quite a different thing from the release by the board of directors of delinquent subscribers without authority, and without consideration, resulting in impairment of the capital prescribed by the agreement under which all the subscriptions were made.

The next assignment of error is that the court erred in refusing to set aside the verdict of the jury as to M. E. Marcuse, on the ground that he was not interested in the subscription with his brother, M. M. Marcuse and was, therefore, not liable for any part of the $25,000 unpaid subscription. It appears from the evidence that in a letter written April 21, 1928, by M. E. Marcuse to Thalhimer, the writer said: "You know I am in on the underwriting for $50,000 of M. M., and I didn't intend to underwrite $87,000 * * * and that temporarily you and I might have to go to the bank and raise a part of this money, but I didn't understand you wanted me to join in an additional underwriting."

M. E. Marcuse testified in explanation of this admission as follows: "I meant this—that if at any time in the future my brother asked me to relieve him of any part of it, I would do so; any time I was in funds and he wanted it and I would go to him and take it."

M. M. Marcuse testified as follows:

"Q. Now, Mr. Marcuse, what has been the practice of the whole Marcuse family in relation to investments generally?

"A. The history of our whole business life has been that when it comes to a business matter we work together. In

fact, father taught us that the best way to avoid rows in the family was for one not to get along better than the other, and in all our history we have, as far as our business investments were concerned, worked together. We have drawn the same salaries no matter whether one was more active or not. As far as business relations were concerned, we usually consulted one another and worked together in that way."

While it is true that M. M. Marcuse denied that Milton E. Marcuse was interested in the subscription in question, we think, under the circumstances, the question of the liability of Milton E. Marcuse was entirely one for the jury, and the jury having found against him, and their verdict having been approved by the trial court, this court does not feel justified in disturbing it.

The remaining assignment of error, as to the ruling of the trial court in holding that the resolution of release was not passed by a legally constituted quorum of the board of directors, having been already disposed of, requires no further discussion.

Upon careful consideration of the whole case, we find no prejudicial error in the record, and the judgment of the court below is, therefore, affirmed.

*Affirmed.*